Filed 5/29/14  P. v. Williams CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C068754 |
| v. | (Super. Ct. No. 08F01226) |
| JOSEPH RAHEEM WILLIAMS, | |
| Defendant and Appellant. | |

Defendant Joseph Raheem Williams shot and killed a man in front of a hotel.  Law enforcement apprehended him several days later, read him his *Miranda*[1] rights and interviewed him.

---

[1]  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

1

The People charged defendant with murder and being a felon in possession of a firearm. At trial, defendant asserted self-defense. A recording of the police interview was played to the jury. The jury found defendant guilty of voluntary manslaughter and of possessing a firearm.

The trial court imposed the maximum sentence of 11 years for manslaughter, 10 years for a firearm enhancement and one year for a prior prison term, suspending an eight-month term for firearm possession.

Defendant now contends (1) the prosecutor committed misconduct during closing argument; (2) the trial court erred in admitting defendant's interrogation statements to the police in violation of *Miranda, supra,* 384 U.S. 436 [16 L.Ed.2d 694]; (3) his failure to respond to certain police questions was used against him in violation of *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*); and (4) in sentencing defendant, the trial court ignored the jury's findings, failed to consider mitigating factors and demonstrated animus toward defendant.

We conclude (1) the prosecutor's comments were a legitimate response to the evidence, and we presume the jury followed the trial court's instructions rather than the prosecutor's arguments; (2) based on the totality of the circumstances and giving deference to the trial court's findings of fact, defendant's statements in the interrogation could be interpreted by a reasonable police officer as expressions of frustration rather than an invocation of the right to remain silent, and defendant did not effectively invoke his *Miranda* right to halt the questioning; (3) any error in allowing the prosecutor to comment on the recorded interrogation statement was harmless beyond a reasonable doubt; and (4) in sentencing defendant, the trial court did not err and did not abuse its discretion.

We will affirm the judgment.

BACKGROUND

Lashaun Blake was celebrating her 17th birthday with friends at the Double Tree Hotel. In another room, Alex Hunter was celebrating his 21st birthday with his siblings and friends. Defendant and "Goldie" Benoit had joined the party of teenage girls because they knew Blake's boyfriend. Benoit, defendant and two of the girls made a trip to a nearby convenience store in Benoit's car. At about the same time, Hunter, his brother and their two sisters were walking toward their cars. Benoit was "driving crazy" as he prepared to park his Ford Taurus.

After yelling at the Hunter group to move, Benoit narrowly missed hitting them with the car. As defendant and Benoit got out of the car, there was an exchange of heated words. Hunter followed defendant's group as they walked away, challenging them to fight. Defendant responded to Hunter's unexpected tap on the shoulder by turning and shooting him at a range of less than three to four feet, killing him with a single gunshot wound to the chest. Defendant and Benoit ran away.

Police arrested defendant several days later and questioned him. During the interrogation, defendant said only that he "didn't do the shooting." At trial, he asserted self-defense, saying he believed the victim had a gun and was threatening him when he pulled the trigger. The trial court denied defendant's motion in limine to exclude evidence from defendant's interrogation and the jury saw a video recording of it.

The jury found defendant not guilty of murder but convicted him of voluntary manslaughter. The jury also found true the allegation that defendant personally used a firearm. The trial court sentenced him to an aggregate of 22 years in prison. Additional facts are included in the discussion as relevant to the contentions on appeal.

DISCUSSION

I

Defendant contends the prosecutor engaged in misconduct by suggesting in closing argument that defendant's claim of self-defense had to be rejected because the

3

victim did not have a gun. Defense counsel promptly objected to the argument, but the trial court overruled the objection and refused to admonish the jury. Defendant argues this was sufficient grounds for the mistrial he sought in the trial court and for reversal on appeal.

Prosecutorial misconduct violates the Fourteenth Amendment when it " 'infects the trial with such unfairness' " as to make the conviction a denial of due process. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.) Even if the conduct does not reach that level, it may violate California law if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*Ibid.*) Regarding closing arguments, "It is within the domain of legitimate argument for a prosecutor to state his deductions or conclusions drawn from the evidence and to relate to the jury that, in his opinion, the evidence shows that the defendant is guilty of the crimes charged, unless his statements are not based upon legitimate evidence or are to the effect that he has personal knowledge of the defendant's guilt." (*People v. Calpito* (1970) 9 Cal.App.3d 212, 223, citing *People v. Dillinger* (1968) 268 Cal.App.2d 140, 144.) It is not proper, however, for a prosecutor to misstate the law or resort to personal attacks on the integrity of opposing counsel. (*People v. Bell* (1989) 49 Cal.3d 502, 538.)

Here, defendant claims the prosecutor "implied a lower burden of proof" and shifted the burden of proof to defendant. Noting that not a single witness said the victim had a gun, the prosecutor argued: "Why is it so important to the defense that [the victim] have a gun? Because that's the one way they are trying to create this situation where it could be justified to use a gun on an unarmed person. It is not justified to shoot down an unarmed person. That is not what self-defense is all about." Defendant immediately objected, saying the argument misstated the law. The trial court overruled the objection.

One element of self-defense is a reasonable belief that a person is in "imminent danger of being killed or suffering great bodily injury." (CALCRIM No. 505.) The jury was so instructed. The law recognizes, of course, that great bodily injury can be inflicted

4

without a firearm.  (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1035 [finding the key inquiry in an aggravated assault conviction is the nature of the force applied by a defendant, not whether he used a weapon].)  Defendant testified that the victim claimed to be a "UFC fighter," which defendant understood to mean someone who fights in a cage for money or sport.[2]  Defendant contends the prosecutor's statement impermissibly led the jury to conclude that defendant had to prove the victim had a gun, instead of the prosecutor having to prove that defendant did not act in self-defense.

On review of alleged misconduct in a closing argument, we must examine the context of the argument as a whole.  (*People v. Cole, supra*, 33 Cal.4th at p. 1203.)  In this case, defendant contended that, at the very beginning of the conflict, the victim threw up his hand and raised his shirt to "flash[]" a gun.  He went on to testify that he did not know why, but the victim followed him as defendant and his friends tried to make their way back to their hotel room.  He said the victim persisted in demanding a fight and saying something about a gun.  Defendant said he was trying to avoid a fight by walking away in the moments before he shot the victim.  But as defendant reached the stairs, he said he felt a pull on his left shoulder as the victim turned him around and suddenly they faced one another at very close range.  He said he did not intend to shoot anybody, but "[i]t just happened."  He said he did not want the victim to shoot him or pistol-whip him.

Following the defense objection, the prosecutor continued his closing argument, pointing out that although the victim's actions were not consistent with having a gun, he did talk about fighting, calling defendant and his friend cowards.  The prosecutor said, "Again, no one is excusing his behavior.  He is being a jerk that night.  If he would have let it go, he'd still be alive, but he didn't.  But he didn't ever talk about having a gun.  No

---

[2]  The parties stipulated that the ultimate fighting championship or UFC is sponsored by MMA, the world's premier mixed martial arts organization, and that it features men who engage in boxing, wrestling, judo and other martial arts.

one heard him say I'm going to shoot you. He talked about fighting." The prosecutor rhetorically asked whether the victim would not have just pulled the gun out if he had one, instead of tapping defendant on the shoulder to say, "I'm talking to you," as one witness had testified.

Moments later, the prosecutor continued, "As far as the stand your ground, I mean, that's the law. . . . But if you stand your ground, you still are limited to using the force that is necessary under the circumstances, you know, to meet the threat. You can't use any more force than is necessary to meet the threat, even when you are standing your ground." He went on, "the point I was making earlier in my first argument is that you still cannot use any more force than is necessary. [¶] So the decision you have to make then . . . is whether or not the defendant actually, actually felt that he was in imminent danger of death or great bodily injury requiring the immediate use of force."

The prosecutor accurately defined the jury's decision as "whether or not the defendant actually, actually felt that he was in imminent danger . . . of great bodily injury requiring the immediate use of force." Addressing the statement to which defendant objected once more, he continued, "And, you know, you can feel that way if another person isn't armed. I mean, that's -- that's -- if I misspoke before, that is true, you can be in that position where you feel like you have to use deadly force because you feel like you are actually in imminent danger of death or great bodily injury requiring the use of immediate force. The other person doesn't have to be armed for you to meet that point, obviously."

Defendant claims the prosecutor "did not clarify his previous misstatement" because he did not make it "explicitly clear" that defendant's shooting could be justified even if the victim did not have a gun. He further contends that the trial court abused its discretion when it "implicitly endorsed" the misstatement by overruling defendant's objection.

6

We disagree. As we just recounted, defendant testified that, at the time he pulled the trigger, he feared being shot or pistol-whipped by the victim. The prosecutor's comments about the reasonableness of defendant's fear were legitimately part of closing argument. In context, the prosecutor's single statement about shooting an unarmed man was not likely to be perceived as an explanation of the law of self-defense but as an attack on the reasonableness of the defense theory and the evidence supporting it. Moreover, we presume that the jury relied on the instructions of the trial court, not the arguments of counsel. (*People v. Morales* (2001) 25 Cal.4th 34, 47.) The jury was instructed to follow the law as explained by the trial court and was told, "If you believe that the parties' comments on the law conflict with my instructions, you must follow my instructions." Defendant has asserted no objection to the self-defense instruction, CALCRIM No. 505. The prosecutor's statement did not infect the trial with unfairness so as to deprive defendant of due process, nor did it employ deceptive or reprehensible methods to persuade the jury.

We find no merit in defendant's contention that the trial court "implicitly endorsed" a misstatement of law simply by overruling a defense objection. The instruction was correct and any misstatement by the prosecutor was corrected by the prosecutor and addressed again by defendant's closing argument. Among other things, defense counsel argued in closing that the law clearly and undoubtedly gave defendant "an entitlement to use self-defense" to avoid "great bodily injury, if not being shot." Defense counsel said "any reasonable person" under the circumstances would believe they were in imminent danger of death or great bodily injury, and he emphasized that even if the victim was not a fighter and did not have a gun, defendant was entitled to defend himself if his belief about the threat was reasonable at the time. The jury found defendant not guilty of murder, which is inconsistent with defendant's claim that they may have adopted the prosecutor's statement that shooting an unarmed man was never justified. There was no prosecutorial misconduct and no prejudice.

7

Defendant next contends his conviction must be reversed because the trial court erroneously admitted evidence that violated his *Miranda* rights.

The police arrested defendant a few days after the shooting and questioned him later that day. Before trial, defendant moved to exclude the interrogation on the ground that he had asserted his constitutional right to remain silent by not answering pertinent questions. The trial court denied the motion and allowed the jury to see a video recording of the police interview. After reviewing a transcript and listening to the recording, the trial court found that the interviewing detective gave defendant appropriate warnings at the start of the interview and defendant affirmatively responded that he understood them. The record supports the trial court's conclusion that defendant's waiver was knowing, intelligent and voluntary.

Defendant argued that even if his initial waiver was effective, he invoked his right to cut off questioning by not answering questions about the crime or by giving only evasive answers to questions about the crime. But the trial court found that defendant interspersed silence with numerous responses and did not clearly communicate to the detective that the interview was over. The trial court found defendant "never invoked his right to remain silent" and, because the statements were voluntary, they could be admitted into evidence. After the ruling, defense counsel urged the trial court to reconsider a segment of the interview in which defendant said to the detective, "I don't wanna talk about that, bro." The trial court determined that the phrase referred to the subject of the police chase preceding defendant's arrest, although defendant urged that it related to the crime. Defendant raised the issue again after opening statements and the trial court agreed to accept his objection as continuing throughout the trial.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself" and the Fourteenth Amendment extends this right to state criminal prosecutions. (*Malloy v.*

*Hogan* (1964) 378 U.S. 1, 12 [12 L.Ed.2d 653, 662].)  *Miranda* warnings implicitly promise there will be no penalty for exercising the right to remain silent.  (*Doyle, supra,* 426 U.S. at pp. 618-619 [49 L.Ed.2d at p. 98].)  "A person who initially waives his or her *Miranda* rights retains the right to cut off further police interrogation."  (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1526.)

The question presented is whether defendant asserted his right to remain silent after the interview began or whether he was just selectively evasive.  "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' "  (*Michigan v. Mosley* (1975) 423 U.S. 96, 104 [46 L.Ed.2d 313, 321], fn. omitted [quoting *Miranda, supra*, 384 U.S. at pp. 474, 479 [16 L.Ed.2d at pp. 723-724, 726]].)  A California court has held that there is " 'no right to remain silent selectively' " after a *Miranda* waiver (*People v. Hurd* (1998) 62 Cal.App.4th 1084, 1093), but a federal court deemed that decision "incorrectly and unreasonably applied [to] clearly established law."  (*Hurd v. Terhune* (9th Cir. 2010) 619 F.3d 1080, 1089.)  The Ninth Circuit determined that the right to silence pertains independently to each question posed.  (*Id*. at p. 1087)  There is no definitive Supreme Court guidance on the extent to which interrogation evidence is admissible when a defendant answers some questions but not others.  (*People v. Bowman* (2011) 202 Cal.App.4th 353 364 [listing cases illustrating split of authority].)

On review, we accept the trial court's resolution of disputed facts and inferences if they are substantially supported by the evidence, before applying federal standards to independently determine whether a challenged statement was elicited in violation of *Miranda*.  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032-1033.)  "In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously'* assert his right to silence or counsel."  (*People v. Stitely* (2005) 35 Cal.4th 514, 535, citing *Davis v. United*

9

*States* (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 371].)  To determine whether there was an unambiguous assertion of the privilege after an initial waiver, we review the totality of the circumstances and the context of the words a defendant has used. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238.)  Doing this, we employ an objective standard, that is, whether a reasonable police officer would have understood the defendant's statements to require immediate cessation of questioning.  (*People v. Nelson* (2012) 53 Cal.4th 367, 376-378, citing *Davis v. United States, supra,* 512 U.S. 452, 459 [129 L.Ed.2d 362, 371] and *Berghuis v. Thompkins* (2010) 560 U.S. 370 [176 L.Ed.2d 1098].)  Expressions of frustration or animosity do not invoke the right to silence. (*People v. Williams* (2010) 49 Cal.4th 405, 434 [" 'I don't want to talk about it' " was not an invocation].)

In this case, a few minutes after issuing *Miranda* warnings, the detective said, "Do you know why you're here?" and offered an explanation to which defendant did not respond.  After the detective continued, saying several people identified defendant as the "shoot[er]" at the hotel, defendant responded with a minute-long silence, then said, "Got a little bed in this joint?"  After a colloquy about defendant being tired from the police chase at the time of his arrest, the detective asked, "What did you do on Saturday, Joseph?"  Defendant responded, "I'm gonna go right back on the ground to sleep."  When defendant repeated the statement, the detective reflected that, if defendant went to sleep, they would not "get very far on what we've got to talk about," to which defendant replied, "I don't wanna talk about that, bro."

After a brief and largely unintelligible exchange about the chase, the detective said, "I'll let you sleep a little bit," and left for about 20 seconds; when he returned, there was a brief conversation in which defendant said he wanted to go to jail and the detective said he would be taken to jail after unnamed others had been interviewed.  The detective left again for two minutes, returning with photographs.  Defendant acknowledged a photograph of the victim, saying he had "seen him around," then asked again to be taken

10

to jail.  The detective said, "Oh you will [but] what you go to jail for [depends] on how this plays out," and showed defendant more photographs.  Defendant looked at the photographs but deflected questions.  A few minutes later, the detective pointedly asked, "Did you not shoot the guy or did you shoot the guy?" to which defendant responded, "I didn't do the shooting."

For 13 minutes, defendant evaded and deflected the detective's follow-up questions, alternating silence, mumbling, saying he was sleepy and asking to be taken to jail, but never actually responding or asserting his rights; the detective finally confirmed defendant had nothing to say and just wanted to go to sleep.  In the midst of the detective's follow-up questions, defendant twice asked, "This even legal?" to which the detective responded, "We wouldn't do it if it wasn't legal.  We're the police."  The entire interview lasted about 30 minutes.

The trial court reviewed the recorded interview and concluded from defendant's bantering that "this defendant has apparently extensive contact with law enforcement" and had the "clear ability to communicate to the detective that the interview was over" but "did no such thing."  The trial court concluded that the statement "I don't wanna talk about that, bro" referred to the chase preceding defendant's arrest, not the shooting. Evaluating the totality of the circumstances and giving deference to the trial court's findings of fact, we conclude that defendant's statements could be interpreted by a reasonable police officer as expressions of frustration rather than an invocation of the right to remain silent.  (See *People v. Rundle* (2008) 43 Cal.4th 76, 115, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 [right to silence not invoked by expressions of frustration or animosity or refusal to discuss a particular subject]; *People v. Silva* (1988) 45 Cal.3d 604, 630 [same].)  We conclude defendant did not effectively invoke his *Miranda* right to halt the questioning.

11

Defendant contends that, even if his *Miranda* rights were not violated, the trial court violated his constitutional rights by allowing the prosecutor to show the jury his postarrest interview and describe his nonanswers as proof of guilt.

In *Doyle*, *supra*, 426 U.S. 610 [49 L.Ed.2d 91], the United States Supreme Court said "every post-arrest silence is insolubly ambiguous" due to the assurances implicit in the *Miranda* warnings that silence will carry no penalty. (*Doyle*, *supra*, 426 U.S. at pp. 617-618 [49 L.Ed.2d at pp. 97-98].) Impeaching a defendant with his post-*Miranda* silence is a violation of the due process clause of the Fourteenth Amendment. (*Id*. at p. 619 [49 L.Ed.2d at p. 98].) Post-*Miranda* silence may not be used as evidence of guilt during the prosecution's case-in-chief. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118; *People v. Cockrell* (1965) 63 Cal.2d 659, 669.) Similarly, nonanswers by a suspect in custody may not be used as adoptive admissions. (*People v. Lopez, supra,* 129 Cal.App.4th at p. 1526 [curse preceding request for counsel]; (*Hurd v. Terhune, supra,* 619 F.3d at pp. 1088-1089 [refusal to demonstrate shooting].) Silence at the time of arrest is not especially probative and has a high risk of causing prejudice that is not likely to be overcome by explanation. (*United States v. Hale* (1975) 422 U.S. 171, 180 [45 L.Ed.2d 99, 107].)

"Under the rationale of *Doyle,* due process is violated whenever the prosecution uses for impeachment purposes a defendant's post-*Miranda* silence." (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 629 [123 L.Ed.2d 353, 367].) Trial error arising from a defendant's exercise of the right to remain silent is evaluated under federal standards, so it is reversible unless it is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 21, 24 [17 L.Ed.2d 705, 709, 710-711].) When a defendant responds to some questions during a police interview and does not unambiguously invoke his right of silence, the silence does not trigger *Doyle* unless the circumstances lend themselves to an inference that silence or evasive replies were made

in reliance on the Fifth Amendment. (*People v. Bowman, supra,* 202 Cal.App.4th at pp. 364-365.) In this case, the context was a postarrest interrogation, so refusal to discuss the shooting may very well have been based on the Fifth Amendment, particularly given that defendant asked, "This even legal?" after repeated attempts by the detective to provoke a response from him.

The People argue that a criminal defendant should not be allowed "to engage law enforcement [after waiving *Miranda*] and then claim that flippant and evasive answers were in fact in 'silence' in reliance on *Miranda*." They contend the prosecutor's reliance on the interrogation was justified because defendant was trying to use evidence of his silence and evasion as a sword instead of a shield, as that concept was explained in *People v. Champion* (2005) 134 Cal.App.4th 1440 (*Champion*). The People argue the prosecutor focused on defendant's actual responses and demeanor during the interview, which was consistent with the detective's warning that whatever he said could be used against him and was a fair response at trial to his claim of self-defense.

*Champion* involved a prosecutor's reference to a defendant's postarrest silence as a fair response to defendant's trial claim that "no one would listen to him." (*Id.* at pp. 1448, 1450.) Here, however, defendant testified that he acted in self-defense, not that no one would listen to him. Highlighting defendant's failure to tell the police investigator defendant acted in self-defense was not a fair response under *Champion.*

During opening statement, the prosecutor pointed out that, in response to hearing about the evidence against him during the police interview, defendant's recorded response was, "How long I been here for?" and "Got a little bed in here?" "I'm gonna go right back on the ground to sleep." The prosecutor noted that defendant never responded, "[T]he victim had a gun" or "I had to shoot to defend myself." The interview was not mentioned on cross-examination. During closing argument, the prosecutor said, "Think about his attitude, his demeanor on that tape [¶] . . . [¶] [a]nd if you watch that tape, just days after he shot this person, you can see through [his] attitude that he's a cold-blooded

13

killer.  He has no remorse.  He's not feeling bad about it.  He's not showing any fear. . . . [¶] . . . [¶]  Don't you have anything to say about what happened?  . . . [¶] . . .  I'm going to lay down here on the floor . . . .  He had killed a man five days earlier, shot him down and that's his attitude.  No remorse, no fear, definitely didn't have any self-defenses going on."

As we explained in part I, *ante*, a prosecutor may state his own conclusions from the evidence during closing argument and relate his belief that the defendant is guilty. (*People v. Calpito, supra*, 9 Cal.App.3d at p. 223.)  But a prosecutor may not convert a defendant's silence during a police interview into a tacit admission of guilt if the defendant has invoked his right to remain silent or seek counsel.  (*People v. Andrews* (1970) 14 Cal.App.3d 40, 47.)  The prosecutor's comments suggested that defendant's failure to tell police he was defending himself proved he was not.  If defendant had unambiguously cut off questioning or otherwise clearly asserted his right to remain silent, the evidence would have been inadmissible under *Doyle*.  But as we explained in part II, he did not.  In fact, at trial, defendant said he was evasive because he did not trust the detective and did not want to talk to him.

In any event, it is not necessary to decide whether a series of evasive answers punctuated by silence ought to be excluded from evidence under *Doyle,* because we conclude that, in this case, any error in admitting or allowing comment on the recorded interview was harmless beyond a reasonable doubt.

The constitutional harmless error standard is " 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 621, quoting *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 189].)  Defendant admitted that he was carrying a gun on the night of the shooting, even though he knew there was a warrant for his arrest and he could not legally possess a gun.  He said he had the gun with him because he

14

expected to return it to its owner who was "usually . . . around" when there were girls and drugs. He admitted that he spent the evening drinking, smoking marijuana, snorting cocaine and "popping" Ecstasy pills while "shooting dice" and listening to music. Defendant said the victim "flashed" a gun in his waistband from a distance of 30 or 40 feet but, as he approached, the victim appeared to want a fistfight, not a gun battle. The victim did not actually have a gun and defendant admitted his vision was poor. Defendant said he was "high" and was just trying to get away when the victim pulled his shoulder and was suddenly facing him. He said he did not have it in his mind to shoot anybody but he did acknowledge shooting the victim.

The trial court instructed the jury that either heat of passion or imperfect self-defense could reduce the murder charge to voluntary manslaughter. It also instructed the jury that if defendant believed there was imminent danger, the belief "must have been reasonable," that a person is "only entitled to use that amount of force that a reasonable person would believe is necessary" and if defendant used more force than was necessary, "the killing was not justified." The jury's verdict of manslaughter, but not murder, indicates that defendant persuaded the jury he was provoked or that his fear of imminent danger was reasonable, despite his failure to assert self-defense in the police interview. But the jury also must have concluded that he used more force than was necessary. Given defendant's own testimony that the victim was spoiling for a fistfight, suddenly shooting him in the chest at close range was an excessive response that necessarily would have rendered the killing "not justified," regardless of how the defendant's demeanor during the police interview was construed. The guilty verdict was "surely unattributable to" the admission of the interrogation evidence. Any error was harmless beyond a reasonable doubt.

IV

In addition, defendant contends the trial court erred in sentencing him because it ignored the jury's findings, failed to consider mitigating factors and demonstrated animus toward him.

A trial court has broad discretion in sentencing, but it must orally announce its reasons to encourage the careful exercise of that discretion and to enable parties to seek an immediate clarification or change in the event of errors or omissions in its reasoning. (*People v. Scott* (1994) 9 Cal.4th 331, 351.) Claims that a trial court weighed sentencing factors incorrectly or failed to give a sufficient number of valid reasons for the sentence cannot be considered for the first time on appeal. (*Id.* at pp. 352-353.) Here, defendant asserts for the first time on appeal that the trial court's sentencing reasons were improper or insufficient. Defendant did not object to the sentence when it was imposed and did not assert judicial animus or judicial misconduct in the trial court. Accordingly, his contention is forfeited. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.)

Acknowledging his failure to object, defendant contends that his presentencing argument against the upper term preserved the claim and, in any event, an objection would have been futile. Even if that were true, the record does not support defendant's assertion that the trial court ignored the jury's findings, failed to consider mitigating factors or demonstrated animus toward defendant.

In claiming that the trial court considered facts not found by the jury, defendant points to a reference in the probation report indicating that defendant said he "probably would have shot the victim sooner if he had been sober." The trial court commented that the statement was "[u]ndoubtedly" true and that it "is a common tale in Sacramento." Defendant also argues the trial court "implied" that it was ignoring the verdict by noting that the jury considered victim provocation when it found defendant guilty of manslaughter but not murder. He contends the trial court's statement that the jury gave defendant "a tremendous break in view of all the surrounding circumstances" proves that

16

the trial court believed defendant committed murder and improperly made the sentencing decision on that basis.

The trial court apparently found the facts of this case abhorrent and minced no words in explaining the sentence, but even if defendant had preserved an objection to the sentence, we would find no abuse of discretion. (See *People v. Scott, supra,* 9 Cal.4th at p. 349 [standard of review].) Any "factor reasonably related to the sentencing" may be considered in selecting an authorized sentence, including evidence in the probation report. (Cal. Rules of Court, rule 4.420(b).) Some of the aggravating factors that may be considered in imposing sentence include great violence, use of a weapon and conviction of other crimes. (Cal. Rules of Court, rule 4.421(a).) In sentencing defendant, the trial court articulated various aggravating and mitigating factors. Any one of the aggravating factors would have sufficed to justify the maximum sentence. (*People v. Yim* (2007) 152 Cal.App.4th 366, 369.)

In mitigation, the trial court considered that defendant was only 23 years old and that the crime was unlikely to recur because of the victim's provocation. Nonetheless, it concluded the aggravating factors far outweighed the mitigating factors. The probation report recommended the maximum term because defendant was on parole at the time of the crime. Among other things, the trial court noted that the crime involved great violence and great bodily harm, that defendant had engaged in a "continuous pattern of crime from the age of 12," that he had a prior prison term, that he was on parole, and that

he had a poor parole record.  The trial court did not abuse its discretion in sentencing defendant.

DISPOSITION

The judgment is affirmed.

                                                                   MAURO                   , J.

We concur:

               BUTZ            , Acting P. J.

              MURRAY         , J.