[No. D057467. Fourth Dist., Div. One. Dec. 23, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY BRIAN BOWMAN, Defendant and Appellant.

COUNSEL

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McCONNELL, P. J.—

## INTRODUCTION

A jury convicted Jerry Brian Bowman of robbery (Pen. Code, § 211)[1] and false imprisonment (§ 236). The jury also found true allegations Bowman personally used a deadly or dangerous weapon when committing the offenses (§ 12022, subd. (b)(1)). In addition, Bowman admitted having a prior prison

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

conviction (§ 667.5, subd. (b)), a prior serious felony conviction (§ 667, subd. (a)(1)), and a prior strike conviction (§§ 667, subd. (b)–(i), 1170.12). The trial court sentenced Bowman to an aggregate term of 16 years in prison.

Bowman appeals, contending the trial court violated his constitutional right to due process of law by instructing the jury his silence in response to police questioning could be considered an adoptive admission. He additionally contends the trial court violated his constitutional right to due process of law by instructing the jury his efforts to establish an alibi could show consciousness of guilt. We conclude these contentions lack merit and affirm the judgment.

## BACKGROUND

*Prosecution Evidence*

Just after midnight on March 22, 2009, Victor Hugo Lopez Munoz[2] took a trolley home from work. He got off at a trolley station a few blocks from his apartment. As he was walking home, an African-American man he later identified as Bowman approached him and asked in a courteous tone, "Hey, do you have money? Hey, can you give me money?" Lopez responded, "No, I don't have any money."

Bowman again asked for money and Lopez again responded he did not have any. Bowman stepped closer to Lopez and changing his tone, asked him once more, "Do you have money?" When Lopez again said he had none, Bowman said, "Show me your wallet." Lopez said he did not have a wallet and Bowman replied, "Okay."

Bowman was quiet for about two seconds. Then, he stepped forward, hugged Lopez with both arms to his waist, and squeezed him hard. Lopez tried to push Bowman off, but Bowman was stronger.

While holding Lopez with one hand, Bowman searched his pants pockets. He took Lopez's cell phone, MP3 player, trolley pass, and debit card. Bowman kept the MP3 player, but gave the cell phone back saying, "Keep it because you are going to cancel it."

Bowman asked Lopez for his personal identification number (PIN) for the debit card. When Lopez told Bowman he did not know the PIN, Bowman

---

[2] Although the record frequently refers to the victim by his maternal surname, Munoz, we refer to him by his paternal surname, Lopez, as that is the surname he provided for himself at trial.

pulled out a knife, pressed a button causing the blade to come out, and said, "Now do you know it?" At the same time, Bowman opened his eyes "big" to scare or intimidate Lopez, and Lopez quickly gave him the PIN.

Bowman then asked Lopez questions about his family. After about four questions, Bowman grabbed Lopez and said, "Follow me." Bowman held Lopez by the arm until they crossed the street. Bowman then let go of his arm and told him to go to the side of a convenience store. Lopez started walking away from Bowman and responded, "No. You want money, right? Let's go inside the [convenience store]." Bowman continued to direct him to the side of the convenience store, but Lopez walked faster towards the store's entrance. When Lopez neared the store's door, he ran inside and asked for help. Meanwhile, Bowman ran away.

Lopez went home and called the police. Lopez described the robber as an African-American male, with brown eyes, around 25 years old, 160 pounds, and about the height of the interviewing officer, who was six feet two inches tall. Lopez could not see the robber's ears or describe the robber's hair because the robber was wearing a hooded jacket. Bowman is African-American and, at the time of his arrest, was 26 years old, five feet 11 inches tall, and weighed 170 pounds.

Lopez's bank was closed when the robbery occurred. He canceled his debit card two days later when his bank reopened. In the meantime, approximately $600 had been withdrawn from his account. Earlier that morning, an auto-mated teller machine (ATM) photographed a man withdrawing money from Lopez's account. Lopez could not identify the person in the photograph because the photograph was blurry.

Almost two weeks after the robbery, Lopez went to the same trolley station to take the trolley to an adult school. He saw Bowman at the station. When the trolley arrived, both he and Bowman got on it. Lopez was "very sure" Bowman was the robber and called the police on his cell phone. Bowman and Lopez both got off at the stop for the adult school. Lopez followed Bowman at a distance and they both went into the school.

Lopez told the school guard Bowman had robbed him. The guard notified a secretary who asked Bowman in Lopez's presence "Is it true that you robbed [Lopez]?" Bowman answered, "No, I didn't rob him. I don't know him." When Bowman spoke, Lopez recognized his voice as the robber's. Bowman told Lopez to look at him and to look at his identification. Lopez replied that he did not need to see Bowman's identification because he knew Bowman was the robber. As Bowman spoke to Lopez, Bowman opened his eyes "big" as he had done during the robbery. Lopez felt Bowman was intimidating him.

A police detective went to the school and spoke separately with Lopez and Bowman. Lopez described the robbery to the detective and told him that, during the robbery, the robber held a black cell phone in his hand. Lopez said the robber's cell phone was smaller than his phone and did not flip open. It just had a numeric keyboard. The detective obtained Bowman's cell phone from him. The phone matched Lopez's description. The detective showed Bowman's cell phone to Lopez, who identified it as the cell phone he had seen the robber holding. Lopez also identified Bowman's cell phone at trial. He testified he remembered seeing the brand name on the phone during the robbery.

The detective told Bowman where the robbery occurred, and Bowman told the detective that he did not go to that particular part of the city. The detective searched Bowman and found a document with a preprinted address located in the same vicinity as the robbery. The detective "thought that was strange because [Bowman] just had told [him] he wasn't in that particular area or doesn't go in that area." Bowman told the detective he lived at that address with his girlfriend, Taneshea Nelson, and he had spent the night with her at that address on the night of the robbery.

The detective arrested Bowman, transported him to the police station, and advised him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda* warnings). Bowman spoke with the detective for about 20 to 30 minutes. Bowman denied being the robber and denied being in the area where the robbery occurred. He told the detective he was with Nelson the night of the robbery. Bowman never mentioned Marissa Reese nor did he say he stayed at a motel with her on the night of the robbery.

The detective spoke with Nelson three times. Nelson initially told the detective Bowman was her boyfriend and he lived with her. She later told the detective that Bowman was a "booty call," meaning he just came over late at night for sexual favors. Nelson also told the detective that Bowman did not live with her, but had stayed at her home a few times and kept some clothes there. The detective showed Nelson the ATM photograph of the man who withdrew money from Lopez's account. The man was wearing a ball cap and an earring in his left ear. Nelson initially said she did not recognize the man. She later said the man appeared to be Bowman as she recognized his ears, his facial expression, and his earring. She said Bowman wore a fake diamond stud earring in his left ear. At trial, however, she testified she did not know the man in the photograph. She also testified she never saw Bowman wear an earring and to her knowledge he did not wear one. She denied ever telling the detective anything to the contrary.

Nelson additionally testified that Bowman had not spent the night at her house the night of the robbery. Approximately two months after the robbery, Bowman wrote Nelson a letter in which he stated he was going to trial and "theres some very important things I need ya to do For me please. Do not talk to that investigator or nobody if they keep messing with you just tell them to leave you alone they caint Force you to do any thang don't answer no question dont answer there calls nothin . . . they are tryin to use you against me Dont let them in the house Dont let them see my clothes mess with them or nothin . . . Listen to me if they come over dont answer the Door dont answer there calls nothin . . . Listen what Im sayin okay. Dont speak to them Folks Dont let im see my clothes no body." (Original errors.) Although Nelson recognized Bowman's handwriting in the letter, she never received it.

*Defense Evidence*

Reese, who had a prior conviction for loitering with the intent to commit prostitution, testified she and Bowman, who was her boyfriend at the time, checked into a motel early in the afternoon before the robbery. They left their motel room once or twice, but they returned while it was still daylight. She did not see or hear Bowman leave the room after dark. They remained in the room until they checked out the next morning.

Reese acknowledged Bowman called her from jail the day after his arrest and urged her to find Nelson to be his witness. During the conversation, Bowman said, "Listen, on the day that they said they seen me, I am in [Nelson's] house chillin'." Reese responded, "Yes, yes, exactly. That's your way out . . . ." Bowman urged Reese to find Nelson because Nelson was his witness. Reese asked Bowman where she could find Nelson, and Bowman gave her Nelson's contact information. Reese subsequently called Nelson and told her she needed to be a witness for Bowman.

Reese testified she believed Bowman needed Nelson to establish an address for parole purposes and told Nelson she needed to be Bowman's witness for that purpose. Reese conceded, however, that during her phone conversation with Bowman, he did not mention being in trouble with his parole officer nor did he ask her to have Nelson talk to his parole officer. Instead, Bowman wanted Reese to have Nelson talk with the detective investigating the robbery.

The general manager of a motel near the Mexico border testified that a guest registration card showed Bowman checked in sometime in the day before the robbery and checked out sometime in the day after the robbery. Although the registration card did not show the precise time Bowman checked in, the general manager testified on cross-examination that the information could be ascertained from other records.

Bowman's mother testified the man shown in the ATM photograph was not Bowman. She said Bowman was larger and had broader shoulders. She also said she had never seen Bowman wear a ball cap like the one worn by the man in the photograph. In addition, she did not recall seeing Bowman wear an earring or ear stud in either ear in the months preceding the robbery when he was living with her, although she acknowledged he had his ear pierced and wore an earring when he was a teenager.

Bowman's parole officer who was identified at trial as a state employee who had been regularly meeting with Bowman around the time of the robbery did not recall Bowman wearing an earring or an ear stud in his left ear. However, he took a photograph of Bowman during that time showing some type of ear jewelry inside his left ear.

An adult school employee witnessed Bowman telling Lopez to look at his face. The employee testified Bowman did not seem to be bullying or intimidating Lopez. The employee described Bowman's comments to Lopez as "nice comments."

A clinical psychologist specializing in forensic psychology testified about several factors known to influence the accuracy of eyewitness identification. The factors relevant to this case include the cross-racial/cross-ethnic nature of the identification, the victim's level of fatigue, the victim's visual acuity without his glasses, the lighting level, and the duration and angle of the victim's view of the robber. The relevant factors additionally include the robber's use of a weapon, the victim's stress level, the amount of memory decay, the lack of prior acquaintance with the perpetrator, the victim's expectation that the person he identified as the robber was actually the robber, and postevent information reinforcing the victim's expectation. The psychologist further testified there is no correlation between the certainty of an eyewitness identification and its accuracy.

*Prosecution Rebuttal*

The general manager of the motel where Bowman and Reese stayed the night of the robbery searched other records and determined Bowman actually checked into the motel about an hour and a half after the robbery.

A few days after his arrest, Bowman called his sister and asked her to find Nelson to be his witness and to contact the police to establish where he was during the robbery. During the conversation, Bowman did not mention being concerned about having an address for parole purposes.

## DISCUSSION

### I

*Adoptive Admission Instruction*

#### A

As part of the prosecutor's examination of the detective who arrested and interviewed Bowman, the prosecutor asked about three instances in which Bowman did not answer the detective's interview questions. First, the prosecutor queried:

"[Prosecutor]: Did you tell [Bowman] it was suspicious he told you he had never been to [the area where the robbery occurred]?

"[Detective]: Yes, that was one of the questions I confronted him with because I thought it was suspicious he told me he had never been there and I find a document and now he is telling me he lived there also.

"[Prosecutor]: What was his response to your comment?

"[Detective]: Actually, there was really no comment. He couldn't give me an explanation.

"[Prosecutor]: Well, . . . I want to get an impression from you of his response. Was his response silence or was his response, 'I have no comment,' or 'I have no explanation?' There is a difference.

"[Detective]: Actually, he just looked at me and he said nothing. Just looked at me. Didn't respond to my question."

A short while later, the prosecutor queried:

"[Prosecutor]: Did you ask or confront [Bowman] with the fact that the victim had also identified his cell phone?

"[Detective]: Yes.

"[Prosecutor]: What was [Bowman's] response?

"[Detective]: Again, . . . I said, 'Why would the victim identify your cell phone [as the] cell phone he saw during the robbery?' And again he just looked at me and didn't say anything.

"[Prosecutor]: And did you ask him 'Why would the victim identify you?'

"[Detective]: Yes.

"[Prosecutor]: What was his response?

"[Detective]: No response."

Before closing arguments and without objection, the trial court instructed the jury with CALCRIM No. 357. Consistent with Evidence Code section 1221,[3] this instruction informs the jury: "If you conclude that someone made a statement outside of court that tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in his presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all of the circumstances, naturally have denied the statement if he thought it was not true; [and] [¶] 4. The defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

In his closing argument, the prosecutor argued: "And then there is something the law calls adoptive admissions. The detective says to him, you were in the area when the victim was robbed. Sorry, but this is the time the perfect time to say, 'No, I wasn't, the victim is wrong . . . .' If you didn't do it. [¶] The victim identified you and your phone. Again, this is the time to tell the detective, 'No, that's not correct. It wasn't me. It wasn't my phone. I had my phone,' whatever. Not sit there quietly while the detective is asking you these questions. [¶] So the law says, these are adoptive admissions and the state—well, the law doesn't say these two are adoptive admissions, the law says these things could be considered as adoptive admissions."

## B

Bowman contends the trial court erred in instructing the jury it could consider his lack of a response to some of the detective's questions as adoptive admissions because commenting on a defendant's silence during police questioning occurring after receipt of *Miranda* warnings violates the

---

[3] Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

defendant's constitutional right to remain silent as discussed in *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] (*Doyle*). We conclude Bowman has forfeited this contention by failing to object on this ground below. (*People v. Tate* (2010) 49 Cal.4th 635, 692 [112 Cal.Rptr.3d 156, 234 P.3d 428].) Even if Bowman had not forfeited this contention, we conclude it lacks merit.

■ In *Doyle*, the United States Supreme Court held the prosecution may not use a defendant's postarrest, post-*Miranda* silence to impeach the defendant's trial testimony. (*Doyle, supra,* 426 U.S. at p. 619.) *Doyle* involved two defendants who, after being arrested and advised of their *Miranda* rights, made no statements, but subsequently testified at trial they had been framed. On cross-examination, the prosecutor asked the defendants why, if they were innocent, they did not offer this explanation at the time of their arrest. (*Id.* at pp. 612–614.) The court concluded such impeachment was fundamentally unfair and a deprivation of due process because *Miranda* warnings carry an implied assurance that silence will carry no penalty. (*Id.* at p. 618.)

■ The California Supreme Court has extended the *Doyle* rule to prohibit the prosecution's use of a defendant's post-*Miranda* silence as evidence of guilt during the prosecution's case-in-chief. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman*) ["No less unfair is using that silence against a defendant by means of the prosecutor's examination of an interrogating detective even before the defendant has had the opportunity to take the stand."].)

■ The *Doyle* rule, however, is not absolute. It does not prohibit the prosecution's use of a defendant's prearrest silence. (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 628 [123 L.Ed.2d 353, 113 S.Ct. 1710], superseded by statute on another ground as stated in *Hale v. Gibson* (2000) 227 F.3d 1298, 1324.) It also does not prohibit the prosecution's use of a defendant's postarrest silence if the defendant did not receive *Miranda* warnings. (*Brecht v. Abrahamson, supra,* at p. 628.) "Such silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty." (*Ibid.*)

Additionally, the *Doyle* rule does not prohibit the prosecution from cross-examining a defendant who received *Miranda* warnings and then voluntarily spoke with a police detective about discrepancies between the defendant's statements to the detective and the defendant's trial testimony. (*Anderson v. Charles* (1980) 447 U.S. 404, 406, 409 [65 L.Ed.2d 222, 100 S.Ct. 2180] (*Anderson*).) As the United States Supreme Court explained, "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that

merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson, supra*, 447 U.S. at p. 408.)

*Doyle* did not involve, and neither the United States Supreme Court nor the California Supreme Court has directly addressed, the question of whether the *Doyle* rule applies to "selective silence" or "partial silence" cases like this one where a defendant was advised of his *Miranda* rights, elected to speak with a police detective, and then responded to some of the officer's questions, but not others. (See *Coffman, supra*, 34 Cal.4th at pp. 118–119 [court declined to decide whether the *Doyle* rule bars the prosecution's use of a defendant's selective silence as any error was harmless].) Those courts that have addressed the applicability of the *Doyle* rule in selective silence cases have reached differing conclusions. Some courts have concluded the *Doyle* rule does not bar the prosecution's use of the defendant's silence. (See, e.g., *People v. Hurd* (1998) 62 Cal.App.4th 1084, 1093–1094 [73 Cal.Rptr.2d 203]; *U.S. v. Burns* (8th Cir. 2002) 276 F.3d 439, 441–442; *State v. Talton* (1985) 197 Conn. 280, 295 [497 A.2d 35]; *State v. Fluker* (2010) 123 Conn.App. 355, 366–367 [1 A.2d 1216]; *Thomas v. State* (Fla.Dist.Ct.App. 1999) 726 So.2d 357, 358; *People v. McReavy* (1990) 436 Mich. 197, 211–212 [462 N.W.2d 1]; *State v. Smart* (Mo.Ct.App. 1988) 756 S.W.2d 578, 580–581.) Other courts have concluded the opposite. (See, e.g., *Hurd v. Terhune* (9th Cir. 2010) 619 F.3d 1080, 1087; *U.S. v. May* (10th Cir. 1995) 52 F.3d 885, 890; see also Comment, *Rethinking Miranda: The Post-Arrest Right to Silence* (2011) 99 Cal. L.Rev. 151, 163–168; Note, *Protecting* Doyle *Rights After* Anderson v. Charles*: The Problem of Partial Silence* (1983) 69 Va. L.Rev. 155, 166–170.)

■  We are persuaded in this case that the *Doyle* rule did not prohibit the prosecution's use of Bowman's selective silence as adoptive admissions. Like the defendant in *Anderson*, Bowman voluntarily spoke with a police detective after receiving *Miranda* warnings. Although Bowman did not respond to certain questions during the interview, there is no evidence he told the detective he wanted to cease all further questioning, asked for an attorney, or otherwise unambiguously indicated he wanted to invoke his right of silence. (See *Berghuis v. Thompkins* (2010) 560 U.S. ___, ___–___ [176 L.Ed.2d 1098, 130 S.Ct. 2250, 2259–2260] [to cut off questioning by law enforcement officers, an accused must invoke his or her right to remain silent unambiguously]; *People v. Silva* (1988) 45 Cal.3d 604, 629–630 [247 Cal.Rptr. 573, 754 P.2d 1070] [an accused's refusal to answer some questions during the course of a consensual post-*Miranda* interview does not establish the accused invoked his *Miranda* rights].)

Consequently, like the court in *Anderson*, we cannot conclude Bowman's decision not to respond to some of the detective's questions was *induced by* the *Miranda* warnings he received. Absent such inducement, the harm the *Doyle* rule seeks to prevent is not present and the *Doyle* rule does not apply. (*Brecht v. Abrahamson, supra*, 507 U.S. at pp. 628–629; *Anderson, supra*, 447 U.S. at pp. 408–409; see also *People v. Hurd, supra*, 62 Cal.App.4th at p. 1093 ["Once a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal is an invocation of *Miranda* rights."]; cf. *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1519, 1525–1527 [29 Cal.Rptr.3d 586] [After a defendant answered some questions during a post-*Miranda* interview, the defendant's subsequent failure to deny the crime could not be used as an adoptive admission when the defendant's response to the officer's question about why he committed the crime was, " ' "F--k you. I want to talk to my lawyer." ' "].)

■ Our analysis, in addition to being consistent with the rationale underlying *Doyle*, is consistent with recent California Supreme Court guidance on adoptive admissions. As the court explained, " '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, *and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution*, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 661 [114 Cal.Rptr.3d 133, 237 P.3d 474], italics added.) Thus, we conclude the trial court did not violate Bowman's due process right by instructing the jury it could consider Bowman's lack of response to the detective's questions to be adoptive admissions. Given our conclusion, we need not address Bowman's related ineffective assistance of counsel claim.

II

*Consciousness of Guilt Instruction*

A

Without objection, the trial court instructed the jury with CALCRIM No. 362. This instruction informed the jury: "If the defendant made a false or

misleading statement relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such statement cannot prove guilt by itself."

After omitting certain parts sua sponte and other parts at the request of defense counsel, the trial court also instructed the jury with CALCRIM No. 371. This instruction informed the jury: "If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

## B

Bowman contends the trial court constitutionally erred by giving these instructions because the evidence did not support them. We conclude this contention lacks merit.

■ A trial court properly gives consciousness of guilt instructions where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions. (*People v. Alexander* (2010) 49 Cal.4th 846, 921 [113 Cal.Rptr.3d 190, 235 P.3d 873].) Here, there was evidence in the record indicating Bowman told the detective he was with Nelson the night of the robbery. In addition, there was evidence Bowman attempted to have Reese and his sister contact Nelson to be his alibi witness. There was also evidence Bowman wrote Nelson a letter urging her not to cooperate with the police and not to allow the police to see or "mess with" his clothes. Nelson, however, testified Bowman was not with her the night of the robbery. This evidence, if believed by the jury, sufficiently supported an inference Bowman knowingly made a false statement about his whereabouts at the time of the robbery and attempted to obtain false testimony from Nelson. This inference was further supported by Bowman's presentation of a second alibi—that he was at a motel with Reese at the time of the robbery—which the prosecution demonstrated to be false. Accordingly, we conclude the trial court did not err by giving the consciousness of guilt instructions.

## DISPOSITION

The judgment is affirmed.

Nares, J., and McIntyre, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 14, 2012, S199528. Kennard, J., was of the opinion that the petition should be granted.