Filed 3/4/16  P. v. Velarde CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>JOSE AUGUSTINE VELARDE,<br><br>    Defendant and Appellant. | F067948<br><br>(Super. Ct. No. CRM014710A )<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jose Augustine Velarde was tried with codefendant Maria Ceja[1] for the murder of Ana Diaz deCeja (Ana)[2] and the kidnapping of Ana's infant son, A.  The trial took place

---

[1]    Ceja was found guilty of first degree murder and has filed a separate appeal. (Case No. F067979.)

[2]    Because her surname is similar to codefendant Ceja, we refer to her as Ana.

before two separate juries and Velarde was acquitted of first degree murder as charged, but found guilty of the lesser offense of second degree murder (Pen. Code, § 187)[3]. He was also convicted of kidnapping (§ 207, subd. (a)), with the special circumstance that the victim was under the age of 14 (§ 208, subd. (b)), and of child abuse (§ 273a, subd. (a)).

Velarde was sentenced to 15 years to life, with a consecutive term of 12 years, four months. He was ordered to pay various fines, fees and restitution.

On appeal, Velarde contends the trial court erred when it denied his motion to suppress his statement to law enforcement and when it instructed on adoptive admissions. He also contends insufficient evidence supports his conviction for child endangerment. We disagree and affirm.

## STATEMENT OF FACTS

*Background*

Ceja and Velarde lived together in Planada, a small town in eastern Merced County. Ceja's three small children lived with them. Velarde had three daughters who did not live there. Ana and her husband Luis also lived in Planada, with their five-year-old son, Luis Jr., and two-month-old son A. Ana and Ceja were acquaintances.

*Ana's Disappearance on December 2, 2010*[4]

On December 1, 2010, Ceja and Ana saw each other at Planada Elementary School. Ana was holding her son, A. They spoke about the scarves Ceja made and sold, and made plans for Ana to come to Ceja's house the next day to look at her scarves. That evening, Ana told her sister-in-law that Ceja was pregnant and due any day. Ana's sister-in-law thought that odd because she had seen Ceja at the post office a month earlier and

---

[3]     All further statutory references are to the Penal Code unless otherwise stated.

[4]     All further dates are to 2010, unless otherwise stated.

2.

she did not look pregnant. Ana said she was going to Ceja's home the following day to look at scarves Ceja made and sold.

Ana had an appointment at a health clinic in Planada on December 2. Ana's husband had already left for work when her mother-in-law, who lived down the street, came by at 6:45 a.m. to take Ana's son, Luis, Jr., to the school bus, as she did daily. Ana's other son, A. was still asleep.

Between 7:40 and 7:45 a.m., a neighbor saw Ana standing next to her blue Avalanche truck, which was running with the lights on and the driver's door open. Ana was standing by the rear passenger door, which was also open.

Ana's mother-in-law noticed that Ana's car was gone around 11:00 or 11:30 a.m., and it was still gone when it was time to pick up Adrian from the bus stop, so she went and got him and took him to her house.

Ana's husband did not find Ana at home when he got there, and it was evident that the insurance papers she was supposed to take to the clinic that day were still there. The home was not disturbed in any way, and there was meat thawing in the kitchen sink.

*Velarde and Ceja's Activities on December 2*

Velarde arrived at work at a farm in Le Grand, southeast of Planada, at about 7:00 a.m. that day. A few hours later, he asked his friend and co-worker Gabriel Saldana for a ride home because he had a dental appointment. Velarde said Ceja could not pick him up because they had family members at the house. Saldana drove Velarde home; Velarde did not return to work until the following Monday, December 6. Velarde did not mention anything at that time about having a new child.

In the past, Velarde told Saldana several times Ceja was pregnant but then lost the child. Velarde showed Saldana sonogram photos.

On the morning of December 2, Ricardo Casillas, while on Highway 59, outside of Snelling, drove by a car parked on the side of the road. Casillas stopped and asked the woman in the car if she needed help. There was a baby seat on the passenger's side

3.

covered in blankets. He was not sure if there was a baby in it. The woman appeared nervous and said she was waiting for her husband. At trial, Ceja admitted she was approached by a man as she was parked alongside a road, waiting for Velarde.

At around 10:00 a.m. that morning, Micah Zeff, an almond grower, was delivering paychecks to his employees near one of his almond orchards when he saw two cars approaching from the opposite direction, slowly and in tandem. In the lead vehicle, a Hispanic male wearing a baseball cap was driving a Chevy Avalanche pickup; a Hispanic female followed in a Ford Crown Victoria or Mercury Grand Marquis. Ten minutes later, Zeff returned on the same road and saw the woman heading back in the opposite direction, traveling at a normal speed, in the Crown Victoria or Grand Marquis. This time the man was in the passenger's seat. The Chevy Avalanche was later found abandoned in one of Zeff's orchards.

Between 11:00 and 11:30 that morning, Ana's mother-in-law noticed that Ana's car was still gone, so she met Luis Jr. at the bus stop. Ana's failure to meet her son at the bus stop was uncharacteristic of her.

Christian Muñoz was driving machinery in an orchard in Snelling, near Zeff's orchards, at about 10:00 a.m. on December 2 when he noticed a fire about 30 rows away. He did not think much of it, because "they're always burning [something]." But as he grew closer to the fire around 2:00 that afternoon, he and the crew smelled burnt flesh. Muñoz and another walked toward the smoke and discovered a charred body. They notified the foreman and contractor who called the police.

At 2:27 p.m. that afternoon, a Merced County sheriff located the charred body. Other detectives, including Charles Hale, responded to the scene. The body was completely burned, with little visible flesh. Hale photographed a shoe impression. Tire impressions started 20 to 25 feet from the body and led to the main roadway.

Around 4:00 p.m. that afternoon, California Highway Patrol responded to a call of a burning vehicle and found the Crown Victoria still smoking in an almond orchard outside Atwater.  The car was registered to Ceja.

Late that afternoon, a woman was walking on a bike path in Merced when she noticed a baby car seat in Bear Creek.  She notified police after she saw an online article about a missing baby.  At trial, Ana's brother identified the baby seat as A.'s.

At approximately 5:00 p.m. that afternoon, a woman later identified as Ceja and a man later identified as Velarde appeared on a surveillance tape using Ceja's EBT card at Walmart in Merced.  Ceja was holding something covered in a blanket.  A receipt showed the couple had purchased baby bottles, diapers and an infant seat, as well as other supplies and clothing.

An hour later, at 6:00 p.m. Ceja reported her tan Crown Victoria had been stolen from her driveway while she was away.  When the highway patrol officer took the report, he knew the vehicle had already been recovered.

Between 7:00 and 8:00 p.m. that evening, Ana's husband called police and reported his wife Ana and son A. missing.

Telephone records from Ceja and Velarde's cell phones showed that, on December 2, Velarde made two short calls to Ceja at around 7:30 a.m. and one call at 8:11.  Then between 9:12 and 10:06 a.m., there were 14 calls between the two cell phones.  The calls stopped for about three hours and then from 1:05 to 4:00 p.m. that day, there were approximately 43 additional calls between the two phones.

*December 3*

The following morning, December 3, Ana's Chevy Avalanche was found in an orchard about one and a half to two miles from her body.  The tire impressions found near the body seemed to match those where the Avalanche was found.

5.

During the day on December 3, Ceja and a Hispanic man in his 30's came to the tow yard where the burned Crown Victoria had been towed. The two looked at the car, focusing on the trunk for a few minutes, and left.

*December 7*

At about 6:30 a.m. on December 7, Javier Sanchez, who lived in LeGrand, was defrosting his windshield to be able to leave for work when he heard a noise coming from a neighbor's. He walked over and discovered a baby on the doorstep, cold and naked in a pillowcase.

Aurelia Garcia answered the doorbell and Sanchez gave her the baby, who was stiff and cold. The baby's head had been shaved. Garcia called 911 and paramedics were dispatched at 6:44 a.m. The baby was treated for hypothermia during transport and seemed more active by the time they reached the hospital, where the baby was identified as A.

*December 15 Search of Velarde and Ceja's Residence*

A search of Velarde and Ceja's home was conducted December 15. Officers found diapers and a diaper bag, baby wipes and bottles, infant clothing and formula, and an infant seat and bath seat in the house, but no infant. Officers discovered a framed photograph of Velarde and Ceja with a sonogram image attached to the frame. Ceja's name was on the sonogram, which appeared to have been manipulated. A calendar in the house was marked with "Junior's B-day" on December 2 and "Junior left" with a sad face next to it on December 6.

Velarde accompanied Detective Jose Sanchez to the sheriff's station for an interview, but he was not under arrest at that time. Velarde was wearing a hat similar to the hat worn by the man in the December 2 Walmart video.

Velarde was interviewed in Spanish by Detective Sanchez and Detective Mike Ruiz. The interview was recorded on video and played for the jury. The jurors were

6.

provided a written transcript of the interview, which had been translated from Spanish to English.

In the interview Velarde told the detectives Ceja had three previous miscarriages and had recently lost a baby boy during the eighth month of pregnancy. However, the medical records the detectives had contained no information of Ceja having recently been pregnant. Velarde stated he wanted a boy and would name him Junior Augustine.

When asked about December 2, Velarde said he was at work the entire day; he then said he got a ride home around 9:00 in the morning because Ceja called and told him she was sick. Velarde stated Ana, who had come to the house to see and purchase a scarf Ceja made, had fallen down or had an accident while she was there, but he denied baby A. had been at the house.

Velarde then admitted loading Ana's body into the trunk of Ceja's Crown Victoria and driving Ana's Avalanche while Ceja drove her car with the body in the trunk. He eventually admitted Ceja had the baby with her. Velarde purchased gasoline in Snelling and admitted pouring the gasoline on Ana's body and lighting it on fire. After disposing of the Avalanche, the two went home, changed clothes, and then Velarde drove the Crown Victoria followed by Ceja in their Chevy Tahoe to another orchard and lit the Crown Victoria on fire.

Velarde eventually admitted he strangled Ana, who tried to defend herself by kicking. Velarde pinned Ana's hands to her sides with his feet and used both hands to strangle her, a process that took 10 minutes. Velarde did not know why he killed Ana. He did say, through much of the interview, that whatever Ceja "told you is what happened."

### Additional Evidence

Photographs of the tire tread from Ceja's car and photographs of the tire impressions left at the two crime scenes matched.

In late November, before the murder, Jesus Castillo was sitting on a park bench in south Merced when a women stopped in an old brown car and whistled to get his attention. Castillo walked to the passenger side of the car. The woman was alone and there was a baby car seat in back. The woman offered Castillo $1,500 to "rob a baby and hit the lady." The woman stated the baby was her nephew and she did not want the baby staying with his mother. The woman offered him gloves to complete the task. Castillo declined and the woman said she would look for someone else and left. Castillo later identified the woman as Ceja in a photo lineup.

Laurie Hembree first met Ceja in November when Ceja asked Hembree to help her steal some jewelry from Ceja's former mother-in-law for $500. The two went to the former mother-in-law's house and, using a pretense of needing to use the restroom, Hembree snuck into the bedroom and stole the jewelry described by Ceja. She then fled in Ceja's Crown Victoria, which was parked outside with the keys inside, and then abandoned the car a few blocks away, as planned. Hembree was never paid the promised $500.

On November 5, Merced Police Officer Eddie Drum responded to a report of a stolen vehicle and met with the owner, Ceja. Ceja claimed she was visiting her mother-in-law and left her car outside with the keys inside when she saw a woman enter the car and drive off. The car was recovered about four blocks away.

### *Autopsy Results*

Ana's body was identified with her dental records. It was determined that Ana was not alive when the fire started and her cause of death was listed as "possible asphyxia." No internal injuries were found.

### *Velarde's Defense*

Velarde did not testify, but proffered witnesses to discredit Ceja. One such witness, a corrections officer, testified that, while at the hospital for an examination in December of 2012, Ceja told the officer that, if he did not release her, she was going to

8.

have the devil get him.  Ceja wanted the officer to uncuff and unshackle her and let her walk out of the hospital.  When he did not do so, Ceja came after the officer and it took several people to restrain her because she was "pretty strong."  Ceja had to be sedated.

Ceja's mother testified that she took Ceja to a fertility clinic in 2009.  She believed Ceja was pregnant in 2010.

Ceja's son, Carlos, testified that, on December 2, Ceja told him she had had a baby while he was at school that day.  Ceja had told him she was pregnant in January or February, and he thought her stomach appeared to get bigger.  A few days after the baby arrived, Ceja told Carlos she took the baby to the hospital because he was not breathing correctly.

Ceja's former mother-in-law testified that, when the burglary occurred at her house on November 5, Ceja and another woman (Hembree) came to the door and Ceja asked if the other woman could use the restroom.  Ceja then distracted her former mother-in-law by indicating she was pregnant and showed off her stomach, which looked like a pillow.

Ceja's ex-husband testified that, at one point during their marriage, Ceja made a false report of domestic violence against him.  She also accused him falsely of having pornography where their son could see it.

### Ceja's Defense

Ceja testified in her own behalf that she experienced abuse from her first two husbands and was raped by a landlord.  According to Ceja, after she moved in with Velarde in November of 2008, he became violent during sex.  She claimed Velarde got her hooked on methamphetamine and prevented her from seeing her family.

Velarde told Ceja he always wanted a son, but Ceja was no longer able to get pregnant naturally and could not afford the procedure to have a child, so Velarde told her to fake a pregnancy.  Velarde told Ceja he had had an affair and impregnated a woman

9.

and the woman was going to give the child to Velarde because she was married. When Ceja resisted the idea of faking pregnancy, Velarde threatened to rape Ceja's daughter.

Ceja claimed Velarde forced her to participate in the burglary of her ex-mother-in law's home because they needed money for drugs. She also claimed she was prompted by Velarde to ask Castillo about kidnapping a baby and "hit[ting] a lady."

Ceja testified she met Ana and baby A. at the elementary school on December 1 and the two made plans for Ana to come over the next day to look at scarves Ceja made. When Ceja told Velarde that evening that Ana was coming to visit the next day, he said Ana was the woman he had had the affair with and the baby was his. Velarde wanted to talk to Ana when she came over. Velarde then told Ceja to tell her children they would have a new baby brother the next day. Ceja did not believe Velarde was going to hurt Ana or kidnap the baby.

The following day, when Ana was at their home and Velarde arrived, Ana and Ceja went into the master bedroom to look at pictures. According to Ceja, she went to the bathroom for five minutes and when she returned, Velarde was on top of Ana with his hands around her neck. Ceja suggested they call an ambulance, but Velarde told her Ana was already dead. Velarde then directed Ceja to assist him in disposing of Ana's body and truck and then in burning her own car, the Crown Victoria.

Velarde eventually agreed to give A. up and they chose to leave him at a stranger's house. They shaved his head the night before so he would not be recognized.

Ceja presented several expert witnesses in her defense. An expert, who had never met Ceja or reviewed any of her files, testified on the issue of domestic violence. A physician, who also never met with Ceja, testified regarding the effects of methamphetamine abuse. And a licensed psychologist, who had met with Ceja, testified that Ceja had an impaired mental status at the time of the offense and had a borderline personality disorder.

## DISCUSSION

I. MOTION TO SUPPRESS VELARDE'S STATEMENTS TO LAW ENFORCEMENT

Velarde contends the trial court erred in denying his motion to suppress his confession to police because he invoked his right to silence during the interview. We disagree.

### *Procedural Background*

Both Detective Sanchez and Detective Ruiz testified at the hearing on Velarde's motion to suppress. Detective Sanchez testified that, following the search of Velarde and Ceja's home on December 15, Velarde agreed to be brought to the sheriff's department in a county car. Velarde was not handcuffed at the time. Prior to their interview, the detectives were told that Ceja, who had already been interviewed, implicated Velarde in both the murder and the kidnapping. Velarde was interviewed by Detectives Sanchez and Ruiz entirely in Spanish. Following some questions about Velarde's family and occupation, Velarde was read his *Miranda*[5] rights and indicated he understood them. The trial court was shown video clips of the interview, including Velarde's *Miranda* waiver.

Approximately one hour and 39 minutes into the interview, the conversation turned to the topic of where A.'s car seat had been disposed of. At that point, Velarde stated, "I don't want to say anything else. You already know everything." According to Detective Sanchez, at this point in the interview, Velarde "began to shut down" and did not want to talk about "that specific subject." This portion of the videotape was also played in court. Detective Sanchez took Velarde's comments as an indication that they move on and talk about something else.

Detective Sanchez testified that Velarde repeatedly stated, during the interview, "[y]ou already know that," or "[s]he already told you," referring to Ceja. When Velarde

---

[5]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

11.

stated he did not want to talk about the car seat, Detective Sanchez thought Velarde's statement that he did not want to say anything and "[y]ou already know everything" was in line with his prior statements and showed frustration, not an intent to end the interview. Six or seven seconds after he made the statement, he was again asked the same question, and Velarde responded, "Where you found it." The interview continued for approximately another 20 minutes.

Detective Ruiz testified Velarde appeared frustrated throughout the interview, which lasted about two and a half hours.

Following testimony, Velarde's trial counsel argued that Velarde's statement, "I don't want to say anything else," was an invocation to his right to silence. The prosecutor argued that, because Velarde's statement was quickly followed by, "[y]ou already know everything," the statement merely showed frustration on Velarde's part, not an indication that he wanted to end the interview. As argued by the prosecutor, the statement was not unequivocal and Velarde continued to answer questions immediately thereafter.

In its ruling on the motion, the trial court found Velarde was not in custody at his home or when he was initially brought to the sheriff's office. The trial court also found Velarde had not invoked his right to silence during the interview. In making this determination, the trial court went into a lengthy analysis on the record, finding that Velarde's statement, "I don't want to talk about it anymore," was merely "an expression of frustration," as evidenced by his continued response to questions immediately after he made the statement.

> "The totality of the circumstances suggests frustration with detectives asking him questions they presumably already knew because Ceja had allegedly told them. He continued to talk, didn't say anything about not talking, and his body language suggested he wanted to keep talking in addition to his verbal responses."

12.

*Applicable Law and Analysis*

To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a custodial interrogation must first be advised on his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent. (*Miranda, supra,* 384 U.S. at pp. 444, 467-473, 478-479.) As long as the suspect knowingly and intelligently waives these rights, the police are free to interrogate him. (*Id.* at pp. 444, 475, 479.) However, if, at any point in the interview, the suspect invokes his rights, questioning must cease. (*Id.* at pp. 444-445, 473-474; see *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 [questioning cannot resume until request for counsel is granted or the suspect restarts interview].) Statements made in violation of these rules are inadmissible to prove guilt in a criminal case. (*Miranda, supra,* at pp. 444, 476-477, 479; see *People v. Sapp* (2003) 31 Cal.4th 240, 266.)

In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect "must unambiguously" assert his right to silence or counsel. (*Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*).) It is not enough for a reasonable police officer to understand that the suspect might be invoking his rights. Faced with an ambiguous or equivocal statements, law enforcement officers are not required under *Miranda* either to ask clarifying questions or to cease questioning altogether. (*Davis, supra,* at pp. 459-462.) While such an approach may disadvantage suspects who, for emotional or intellectual reasons, have difficulty expressing themselves (*id.* at p. 460), a rule requiring a clear invocation of rights from someone who has already received and waived them "avoid[s] difficulties of proof" (*id.* at p. 458), and promotes "effective law enforcement." (*Id.* at p. 461.)

In reviewing *Miranda* issues on appeal, this court accepts the trial court's resolution of disputed facts and inferences, as well as its evaluations of credibility if supported by substantial evidence. We independently determine from the undisputed

13.

facts found by the trial court whether the challenged statement was legally obtained. (*People v. Smith* (2007) 40 Cal.4th 483, 502.)

Numerous cases have strictly applied the rule requiring an unequivocal invocation of silence. For instance, in *People v. Martinez* (2010) 47 Cal.4th 911, the court found the defendant's statements, "That's all I can tell you," and "I don't want to talk anymore right now," were not unambiguous invocations of the right to silence in the context of that case. (*Id.* at pp. 949-951.) The statements were made after a lengthy interrogation session and after the detective made it clear the session was over. Resumption of interrogation later that day did not amount to a failure to heed suspect's clear refusal to waive his right to silence. (*Id.* at p. 951.)

And, in *People v. Thomas* (2012) 211 Cal.App.4th 987, the statement, "'I ain't talking no more and we can leave it at that,'" was found not to be an unambiguous invocation of the defendant's right to remain silent, but was merely an expression of momentary frustration with the detective's failure to accept the suspect's repeated insistence that he was not present during the crime and with the detective's immediately preceding statement that the suspect was "'hiding something.'" (*Id.* at p. 1006.)

Velarde asserts his case is factually most like *In re Z.A.* (2012) 207 Cal.App.4th 1401. We disagree. In that case, the minor and her boyfriend were arrested after a search of their car in the secondary screening area at the San Ysidro port of entry led to the discovery of a package containing marijuana. (*Id.* at pp. 1405-1406.) Immigration and customs agents interviewed the minor after her arrest and informed her of her *Miranda* rights, including her right to remain silent, which she waived; and she began to answer the agents' questions. (*Id.* at pp. 1408-1409.) Thereafter, the minor told the agents, "'I don't want to answer anymore [*sic*] questions.'" (*Id.* at p. 1410.) Immediately thereafter, the minor said she wanted to know whether her boyfriend "'is going to stay here how much time.'" (*Ibid.*) The agents responded by intensifying their interrogation of the

minor. (*Id.* at p. 1422.) The juvenile court denied the minor's motion to suppress evidence of statements she made during the interrogation. (*Id.* at pp. 1412-1413.)

On appeal, the court reversed the judgment, concluding the juvenile court should have suppressed all of the statements the minor made after she invoked her right to remain silent. (*In re Z.A., supra,* 207 Cal.App.4th at pp. 1422, 1428.) The court explained that the minor "unambiguously invoked her right to remain silent by expressly stating that she did not want to answer any more questions during the interrogation. Immediately thereafter, [she] made a statement to the officers about [her boyfriend's] custody status, stating, '[W]ell, I want to know if [he] is going to stay here how much time.' Rather than expressing a desire to resume the interrogation, [the minor's] statement is more reasonably interpreted as expressing her interest in knowing whether, and for how long, her boyfriend was to remain detained at the border crossing." (*Id.* at p. 1420.) Citing *Oregon v. Bradshaw* (1983) 462 U.S. 1039, the court concluded the minor's inquiry about the custody status of her boyfriend could not reasonably be deemed an invitation to reinitiate a generalized discussion relating to the investigation; rather, it concerned the routine incidents of the custodial relationship. (*In re Z.A., supra,* at p. 1418.) The court noted that, after the minor's invocation, the agents "did not readmonish [her] concerning her right to remain silent or inquire as to whether she wanted to resume interrogation." (*Id.* at p. 1421.) Instead, after the minor invoked her right to remain silent, "the officers failed to 'scrupulously honor[]' that invocation, and instead, intensified their interrogation." (*Id.* at p. 1422.)

Throughout Velarde's interview, he repeatedly stated, "You already know," or "What ever she told you is what happened." Here, when the topic of the car seat was first broached, Velarde told the detectives the car seat was "Where you found it." He then indicated he was in the Chevy Tahoe and not with Ceja when he got rid of the car seat. When asked where he threw it, he said he did not know. When asked again, he said, "I don't want to say anything else. You already know everything." When asked

immediately again where he threw the seat, Velarde stated, "Where you found it" and eventually that it was thrown in the canal.

A reasonable officer in Detective Sanchez and Detective Ruiz's position would have concluded that Velarde's statement ("I don't want to say anything else. You already know everything") when asked where he threw A.'s baby seat, did not end the interview. Instead, when read in context, the statement reflects Velarde's frustration in answering questions he believed the detectives already knew the answers to. Under the circumstances, nothing prevented the detectives from continuing the exchange.

Contrary to what Velarde claims, he did not make an unambiguous request to invoke his constitutional privilege of silence. Velarde did not clearly "assert a right to refuse to answer any questions, ask that the questioning come to a halt, or request counsel." (*People v. Michaels* (2002) 28 Cal.4th 486, 510.) We therefore uphold the admission of the police interview at trial.

## II. JURY INSTRUCTIONS ON ADOPTIVE ADMISSIONS

Velarde contends the trial court erred in instructing the jury it could consider his lack of a response to some of the detectives' questions as adoptive admissions. We disagree.

### Procedural Background

In addition to his motion to suppress his interview with detectives, as addressed above, Velarde made a motion in limine to exclude or redact a number of statements made by the detectives to Velarde during the course of their interview, arguing they were hearsay and irrelevant under Evidence Code section 352.[6] The trial court concluded the

---

[6] The instances Velarde complained of were: (1) the detectives, in essence, stated, in order for Velarde to show "regret," he had an opportunity to do so now. The detective stated, "I know that you are not a bad person. This happened so fast, and after it happened, you got scared." In response, Velarde nodded his head "yes." (2) The detective stated, "Look at me in the eyes, and tell me that you didn't burn[] her.… Remember that there is a lot of evidence." Velarde's response was unintelligible. (3)

16.

statements were adoptive admissions because Velarde had not invoked his right to remain silent, was not silent when confronted with these statements, but instead "provided a verbal response and nonverbal, physical response to each statement and question at issue asked by the detectives."

Evidence Code section 1221 provides for adoptive admissions and states,

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

The trial court instructed the jury on adoptive admissions as follows:

"If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] One, the statement was made to the defendant or made in his presence; [¶] Two, the defendant heard and understood the statement; [¶] Three, the defendant would under all the circumstances naturally have denied the statement if he thought it was not true and; [¶] Four, the defendant would have denied it, but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these requirements have not been met, you must not consider either the statement or the defendant's response for any purpose."

Velarde did not object to the instruction.

---

One detective stated, "I know that you burned [the body]." The other detective then asked "All of this happened because you wanted a son, is that why you did it?" Velarde nodded his head "no." (4) The detective asked Velarde if he remembered if Ceja had told him somebody had stopped to talk to her while she was in the car by the side of the road with the baby and Ana's body in the trunk. Velarde responded that Ceja did not tell him that. (5) The detective asked, "What were you thinking when you were strangling her?" Velarde replied, "I don't know." (6) The detective stated, "[Y]ou were scared, what happened, happened. It happened in seconds, you know. She fought for her life. You know that she didn't deserve this … the family didn't deserve it either, and more than anything, the child is not going to have a mother. Do you understand that? All I'm asking you is for you to have a heart." Velarde responded, "If they already told you that…." (7) The detective questioned Velarde's lack of courage and stated, "Is that how you're going to finish? That low?" To which Velarde replied "Ya [unintelligible]."

17.

*Applicable Law and Analysis*

Velarde contends the trial court erred in instructing the jury it could consider his lack of response to some of the detective's questions as adoptive admissions because commenting on a defendant's silence during police questioning occurring after receipt of *Miranda* warnings violated the defendant's constitutional right to remain silent as discussed in *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*). We conclude Velarde has forfeited this contention by failing to object on this ground below. (*People v. Tate* (2010) 49 Cal.4th 635, 691-692.) Even if Velarde had not forfeited this contention, we conclude it lacks merit.

In *Doyle,* the United States Supreme Court held the prosecution may not use a defendant's postarrest, post-*Miranda* silence to impeach the defendant's trial testimony. (*Doyle, supra,* 426 U.S. at p. 619.) *Doyle* involved two defendants who, after being arrested and advised of their *Miranda* rights, made no statements, but subsequently testified at trial they had been framed. On cross-examination, the prosecutor asked the defendants why, if they were innocent, they did not offer this explanation at the time of their arrest. (*Id.* at pp. 612-614.) The court concluded such impeachment was fundamentally unfair and a deprivation of due process because *Miranda* warnings carry an implied assurance that silence will carry no penalty. (*Id.* at p. 618.)

The California Supreme Court has extended the *Doyle* rule to prohibit the prosecution's use of a defendant's post-*Miranda* silence as evidence of guilt during the prosecution's case-in-chief. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118 ["No less unfair is using that silence against a defendant by means of the prosecutor's examination of an interrogating detective even before the defendant has had the opportunity to take the stand."].)

Velarde contends his repeated responses "if she already told you" and "they already told you" during interrogation were tantamount to silence and could not be used as adoptive admissions. However, even if we accept Velarde's characterization of those

18.

statements as silence, there is no right to selective silence in California.  (*People v. Hurd* (1998) 62 Cal.App.4th 1084, 1092-1093 [a defendant remains partially silent when he selectively chooses to answer some questions and refuses to answer others]; see *People v. Jennings* (2010) 50 Cal.4th 616, 664 [defendant's implied adoptive admission were admissible in evidence]; *People v. Bowman* (2011) 202 Cal.App.4th 353, 365 (*Bowman*) [use of defendant's partial silence did not violate his due process rights].)

In *Bowman,* the defendant "voluntarily spoke with a police detective after receiving *Miranda* warnings.  Although he did not respond to certain questions during the interview, there is no evidence he told the detective he wanted to cease all further questioning, asked for an attorney, or otherwise unambiguously indicated he wanted to invoke his right to silence.  [Citations.]" (*Bowman, supra,* 202 Cal.App.4th at p. 364.) *Bowman* concluded that under those circumstances *Doyle, supra,* 426 U.S. 610, prohibiting the prosecution from using a defendant's postarrest, post-*Miranda* silence to impeach the defendant's trial testimony, did not bar the prosecutor from using the defendant's "selective silence as adoptive admissions." (*Bowman, supra,* at p. 364.) That is, "[a] defendant has no right to remain silent selectively.  Once a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal is an invocation of *Miranda* rights." (*People v. Hurd, supra,* 62 Cal.App.4th at p. 1093.)[7]  We have already concluded that the trial court correctly found that Velarde's statement, "I don't want to say anything else.  You already know everything," was not an invocation of his *Miranda* right to silence.

---

**7**  In light of this clear California authority, we are not persuaded otherwise by a case decided by the Ninth Circuit, *Hurd v. Terhune* (9th Cir. 2010) 619 F.3d 1080, on which Velarde relies, which concluded that a suspect may remain selectively silent without taking the risk that his silence may be used against him at trial.

The trial court did not err in instructing on adoptive admissions. In any event, any error in giving the adoptive admission instruction was harmless. Claims that a defendant's right against self-incrimination was violated is reviewed under the harmless beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. (See *People v. Earp* (1999) 20 Cal.4th 826, 856-858; *People v. Hardy* (1992) 2 Cal.4th 86, 157.) Velarde's argument that the adoptive admission instruction contributed in some way to the jury's finding of guilt is unsound. In the first instance, the adoptive admission instruction, by its own terms, only applied if the jury found, inter alia, that someone made a statement tending to connect Velarde to the crimes and that he would naturally have denied the statement if he thought it was not true. The jury may not have found that the detectives' questions constituted accusations that required a denial. The jury was also instructed that "some of these instructions may not apply," and not to "assume just because I give a particular instruction that I am suggesting anything about the facts." (CALCRIM No. 200.) Assuming the adoptive admission instruction did not apply, the jury presumably disregarded it.

It is true that the prosecutor called attention to the adoptive admission instruction during closing argument. The prosecutor first discussed adoptive admissions generally:

> "In his interview with detectives, you heard that many of his responses were what the law calls 'adoptive admissions.' … [¶] The statement was made to the defendant or made in his presence. The defendant heard and understood the statement. The defendant, under all circumstances, naturally would have denied the statement if he thought it was not true. That's what's called an adoptive admission."

The prosecutor then argued that Velarde's responses to the detectives' questions were adoptive admissions:

> "When you are confronted with something and a reasonable person would say, 'No way. Didn't happen. Not me. I didn't do it.' And if you say nothing or say, 'Whatever she said. If that's what she said, that's the way it happened,' that's what the law calls an adoptive admission. [¶] He didn't deny what a reasonable person absolutely would have rejected with every

20.

fiber of his being. 'It's a lie. I didn't do it. That's not true. It was not me.' [¶] Instead, for most of the interview, you got, 'If that's what she said'; 'she already told you what you already know'; "You already know everything.' [¶] Those are adoptive admissions, ladies and gentlemen and can be treated by you as a confession."

Defense counsel countered the prosecutor's argument by asserting there was not "one shred of evidence that [Velarde] ever participated with [Ceja] in any single act that she ever did that was of a criminal nature." Instead, defense counsel argued, because of Velarde's love for and infatuation with Ceja, Velarde covered for her when he was interrogated. Defense counsel described Velarde as "a man desperately in love, and he has reasons that we may not be able to imagine." Furthermore, the trial court told the jury that statements made by attorneys during argument are not evidence. (CALCRIM No. 222.)

Most importantly, the evidence adduced at trial, even without taking into consideration the statements to which Velarde objects, show Velarde's participation in the murder, kidnapping and child endangerment was strong. Velarde affirmatively confessed to the murder of Ana and provided details of how he strangled her. Witnesses placed Velarde at the house on the day of the murder and kidnapping; witnesses placed Velarde and Ceja near the orchard where the body was taken and burned; tire impressions in the orchard near the body matched those of the car Velarde was seen driving; the Walmart video showed Velarde and Ceja buying baby supplies; baby supplies, but no baby, were found at Ceja and Velarde's house; a calendar found at the house and testimony from Ceja's son indicated a baby had been at the house for a few days.

Therefore, even if the adoptive admission instruction had not been given, the result would have been the same. In view of the totality of the evidence, we conclude beyond a reasonable doubt the admission of evidence of Velarde's "silence" and the prosecutor's reference to it in closing argument did not influence the jury verdict. (*Chapman v.*

21.

*California, supra,* 386 U.S. at p. 24; see also *People v. Delgado* (2010) 181 Cal.App.4th 839, 853-854.)

### III. EVIDENCE OF CHILD ENDANGERMENT

Finally, Velarde contends there was insufficient evidence to support his conviction for child endangerment in violation of section 273a, subdivision (a). We disagree.

*Procedural Background*

Prior to sentencing, trial counsel made a motion to set aside the verdict on child abuse, arguing the evidence was insufficient because it was based on the uncorroborated statement of a coconspirator. The prosecutor countered that Velarde's silence during interrogation constituted an adoptive admission and thus corroborated codefendant Ceja's statement and testimony.

The trial court agreed with the prosecutor, finding Velarde's silence and statement, "I don't know," in response to a question by the detective regarding Velarde's involvement with A. after the murder, an adoptive admission.

*Applicable Law and Analysis*

Section 273a, subdivision (a) provides:

"Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail .…"

In reviewing a criminal conviction challenged as lacking evidentiary support,

"the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

"[M]ere speculation cannot support a conviction." (*People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Reyes* (1974) 12 Cal.3d 486, 500.) "Substantial evidence must be more than evidence which merely raises a strong suspicion of guilt as mere suspicion will not support an inference of fact." (*People v. Martin* (1973) 9 Cal.3d 687, 695; see *People v. Williams* (1971) 5 Cal.3d 211, 216-217.)

Section 1111 provides, in pertinent part, that a "conviction can not be had upon the testimony of an accomplice unless it is corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "In enacting section 1111, the Legislature intended to eliminate the danger of a defendant being convicted solely upon the suspect, untrustworthy and unreliable evidence coming from an accomplice, who is likely to have self-serving motives that affect his credibility." (*People v. Belton* (1979) 23 Cal.3d 516, 526.)

Velarde acknowledges that, generally, corroboration of an accomplice's testimony may be furnished by a defendant's own testimony, admission or confession, or silence in the face of accusatory statement. (*People v. Singer* (1963) 217 Cal.App.2d 743, 753.) But, Velarde argues, his alleged admissions were not admissible evidence because they occurred after he invoked his right to silence and should have been excluded, and the use of his silence in response to interrogation as evidence of guilt was constitutional error.

We disagree. We have already determined that Velarde did not make an unambiguous and unequivocal request for silence and that his adoptive admissions of his culpability in the matter were properly before the jury. Furthermore, Velarde's confession that he murdered Ana and kidnapped A., the video from Walmart showing Ceja and Velarde together buying baby supplies, and evidence that A. was in Velarde and Ceja's home for five days provided corroborating evidence that Velarde was also connected to the child endangerment of A., who was left naked on a doorstep of a stranger in the dead of winter.

We reject Velarde's claim that there was insufficient evidence to convict him of child endangerment.

**DISPOSITION**

The judgment is affirmed.


_____

FRANSON, J.

WE CONCUR:


_____

HILL, P.J.


_____

GOMES, J.

24.