Filed 3/9/22  P. v. Cardin-Heredia CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL ANTHONY<br>CARDIN-HEREDIA,<br><br>        Defendant and Appellant. | A160680<br><br><br>(Sonoma County<br>Super. Ct. No. SCR-715819-1) |

This is an appeal from judgment after a jury convicted defendant Gabriel Cardin-Heredia of voluntary manslaughter and found true the allegation that he personally used a deadly weapon (a knife) when committing the crime.  The trial court sentenced him to an 11-year upper term sentence for manslaughter plus one additional year for knife use.  Defendant challenges the judgment on the grounds that the trial court erred by giving CALCRIM No. 362, the standard jury instruction on consciousness of guilt based on a false statement.  Defendant also seeks resentencing based on ameliorative changes to our determinate sentencing law (Pen. Code, § 1170)[1] effective January 1, 2022, that limit trial courts' discretion to impose

---

[1] All statutory citations are to the Penal Code unless otherwise indicated.

1

the upper term. We remand the matter for resentencing under the newly amended version of section 1170 but otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 18, 2019, an information was filed charging defendant with first degree murder. It was further alleged he personally used a deadly weapon (a knife) to commit the crime. This charge and allegation stemmed from the stabbing of Shaun Avila on May 9, 2018, outside a house on Slater Street in Santa Rosa, in which several women who were associated with both Avila and defendant lived.

## I.   *The Slater Street Residence.*

The primary resident of the Slater Street house at the time of the stabbing was T.B. Avila and T.B. had an eight-year-old daughter. While the pair were no longer a couple, they remained best friends. T.B. also had an 18- or 19-year-old daughter named J.M., who considered Avila to be her stepfather. Avila did not live at the Slater Street house, but he spent a lot of time there.

Defendant's girlfriend, M.L., also lived at the Slater Street house with her mother, T.D. In addition, defendant's half brother, Martinez, was dating yet another Slater Street resident, J.H. J.H. previously dated Avila, and the pair had a two-year-old daughter. Avila still had feelings for J.H. although they broke up in June 2017. He was jealous of J.H.'s relationship with Martinez.

## II.   *The Easter Incident (2018).*

On April 1, 2018, T.B. hosted an Easter party at the Slater Street house attended by defendant, Martinez, their mother (Angela), Avila and others. By evening, they were all intoxicated. At some point, Avila and Martinez got into an argument about J.H. This argument did not turn

2

physical. However, less than an hour later, defendant began arguing with Avila. Defendant was annoyed that Avila and a neighbor were dancing with his mother. Defendant removed his shirt as if ready to fight Avila. Martinez joined in, enraging Avila by mentioning his relationship with J.H.

T.B. managed to separate the men, and defendant walked down the driveway toward his car. However, defendant returned a short time later with Martinez, armed with a knife. Defendant's girlfriend, M.L., jumped on his back to stop him, but he passed the knife to Martinez. Avila was yelling as he walked toward defendant and Martinez. J.M. (T.B.'s daughter) intervened and managed to diffuse the situation, and defendant and Martinez left.

Following this incident, the relationship between defendant, Martinez and Avila worsened. Avila believed that defendant and Martinez were trying to "hurt him and gang up on him" and that "it wasn't gonna be good" if they saw one another. Defendant, in turn, expressed that he wanted no issues with Avila but that it "wasn't going to be good" if they met up. Defendant began to avoid the Slater Street house unless he was picking up or dropping off M.L.

## III. *The Fatal Stabbing.*

On the evening of May 9, 2018, defendant, M.L., and Martinez drove to the Slater Street house in order for M.L. to retrieve some of her belongings. As M.L. exited the car, Avila, J.M. and J.M.'s boyfriend were backing out of the driveway. Avila, who had been drinking, jumped out of the car and approached defendant's car, raising his hands and gesturing as if he wanted to fight. According to J.M., Avila asked the men, " 'Are you guys going to jump me now?' " Avila added, "Come on, motherfucker, let's do this right now. What, are you scared?"

3

J.M. heard defendant respond, " 'Let's not do this right now.' " M.L. then heard Avila say, " 'Do you want to die today?' " J.M. told defendant and Martinez to leave.

A surveillance video (shown to the jury) captured defendant and Martinez exiting defendant's car several times to exchange words with Avila. At one point, after they returned to defendant's car, Avila again approached the car, possibly in response to something Martinez said. Avila kicked the driver's side door, angering defendant and Martinez. Defendant jumped out of the car and stabbed Avila five times: four times in the torso and once in the arm.

Defendant then returned to his car as Martinez and Avila continued to fight. Avila fell to the ground, and at some point Martinez jumped on top of Avila, punching him. Defendant drove his vehicle toward the men, jumped out again, and stabbed Avila a final (sixth) time, in the head.

Defendant and Martinez left the scene. J.M. and her boyfriend drove Avila, who was bleeding heavily and having difficulty breathing, to the hospital. Avila later died from multiple stab wounds, which were found on the right side of his head, right arm, left chest, and back.

According to M.L., who was inside during the stabbing, defendant was remorseful and sad as they drove away. Defendant told M.L. that he stabbed Avila because he was fearful for his own safety and that of Martinez, who was being choked by Avila. Defendant told M.L., " 'I'm so, so sorry. I never wanted this to happen.' " At defendant's direction, M.L. disposed of the knife in a nearby trash can.

## IV. *The Investigation.*

Later in the evening on May 9, 2018, Officer Badger was dispatched to defendant's house. The officer, with the help of defendant's mother, spoke to

4

defendant on the phone. Defendant told the officer he was on the way home. However, defendant did not return home and was apprehended the next day driving with Martinez near the City of Tracy. Officers observed dried blood on Martinez's shorts but no choking marks on his throat.

## V.     *The Defense.*

Evidence revealed Avila had a violent nature. M.L. testified that during the Easter incident, Avila threatened to strike Martinez in the head with a mug and asked him, " 'Do you want to die today?' " Defendant tried to diffuse the tension that day, telling Avila, " 'Come on, bro. I don't want no issues . . . .' " In addition, both J.H. and defendant's mother testified to hearing Avila make threats toward defendant and Martinez in the days following the Easter incident. Defendant's mother warned him to stay away from Avila because Avila wanted to kill defendant and Martinez.

Defendant tried to avoid Avila because he was scared of him. He told T.D. that he harbored no ill will toward Avila and just wished Avila would "drop it . . . ."

There was further evidence regarding unrelated violent incidents involving Avila. For example, M.L. described an incident in 2016 or 2017 at an auto parts store. The store was closed, and Avila was "digging through some stuff" when a man approached him, told him he should not be there, and began recording Avila with his cell phone. Avila grabbed the man's phone and repeatedly punched him, knocking the man down. M.L. described another incident when Avila almost ran down her father with his car.

J.H., who had a child with Avila, testified that he was physically abusive toward her during their relationship and that she told this to defendant.

Another witness, M.S., testified regarding an incident in 2003 when she lived next door to Avila. M.S. loaned Avila's girlfriend money to buy diapers. When M.S. asked for repayment of the loan, Avila hit M.S. and threatened to kill M.S. and her husband.

A forensic psychiatrist testified about the " 'fight or flight' " phenomenon, wherein a person under threat of immediate harm may have a confused sense of reality that causes him or her to be more reactive and less contemplative.

## VI. *Verdict, Sentencing and Appeal.*

On February 3, 2020, the jury found defendant not guilty of first degree murder but guilty of the lesser included offense of voluntary manslaughter (§ 192, subd. (a)). The jury also found true the allegation that defendant used a deadly weapon (a knife) when committing the offense.

On June 16, 2020, the court sentenced defendant to the upper term of 11 years in prison plus one year for the enhancement. On August 5, 2020, defendant filed a timely notice of appeal.

On December 21, 2021, after the parties filed their appellate briefs, defendant filed a supplemental brief seeking resentencing under a legislative change to the determinate sentencing law (§ 1170) that became effective January 1, 2022. The People filed an answering brief in which they conceded that a remand to the trial court for resentencing under the new law was appropriate.

## DISCUSSION

Defendant raises two claims on appeal: (1) the trial court erred in instructing the jury per CALCRIM No. 362 that it could infer his consciousness of guilt based on evidence he made a false statement to M.L. shortly after the stabbing; and (2) the amendatory version of section 1170

that became effective January 1, 2022, applies retroactively to his case and requires resentencing. Only defendant's second claim has merit.

## I. *Instruction on CALCRIM No. 362 was proper.*

Defendant contends the trial court prejudicially erred by giving CALCRIM No. 362 to the jury because it lacked evidentiary support. CALCRIM No. 362, as given to this jury, stated: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." The following record is relevant.

The prosecution requested several instructions on consciousness of guilt based on evidence that defendant (1) took flight after the stabbing (CALCRIM No. 372), (2) asked M.L. to discard the knife he used to stab Avila (CALCRIM No. 371), and (3) falsely told M.L. in the car after the incident that he stabbed Avila because Avila was choking Martinez and he feared Avila would kill Martinez (CALCRIM No. 362).

Defense counsel objected to giving CALCRIM No. 362, arguing that defendant's statements were not made to law enforcement and the evidence did not show they were false. The trial court overruled counsel's objection, reasoning that, "ultimately, what the second half of the instruction says specifically is 'If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself.' Ultimately, the Court finds that it is a triable issue of fact for the Jury to determine

7

whether or not there was a false statement made or not." The trial court's ruling was appropriate as substantial evidence supported the giving of CALCRIM No. 362 to the jury.

" 'False statements regarding incriminating circumstances constitute evidence which may support an inference of consciousness of guilt. [Citations.]' " (*People v. Flores* (2007) 157 Cal.App.4th 216, 221.) A case's evidence warrants the giving of an instruction on consciousness of guilt where there is "some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.) We review a trial court's decision to give an instruction de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

Here, there is evidence in the record that, if believed by the jury, would sufficiently support the inference of defendant's consciousness of guilt based on his making false statements. M.L. testified that, when she returned to his car just after the stabbing and asked what happened, defendant told her (among other things) that he feared for his and Martinez's lives because Avila would not stop choking Martinez even as Martinez turned blue and begged for help. Yet, testimony and video evidence showed defendant had already stabbed Avila five times (four times in the torso and once in the arm) when Avila and Martinez began their physical altercation. The video reflected that Avila and Martinez were "rolling around" and, at some point, Avila managed to climb on top of Martinez, prompting defendant to return from his vehicle and stab Avila the sixth time, in the head.

Based on this evidence, the jury had reasonable grounds to conclude defendant made false statements to M.L. that reflected his consciousness of guilt. (See *People v. Bowman* (2011) 202 Cal.App.4th 353, 366 ["trial court properly gives consciousness of guilt instructions where there is some

8

evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions"]; *People v. McGowan* (2008) 160 Cal.App.4th 1099, 1104 ["trial court properly left it for the jury to determine whether defendant's statement to police was false or deliberately misleading, and if so, what weight should be given to that evidence"].) Moreover, even if we could find the giving of CALCRIM No. 362 erroneous (we cannot), defendant suffered no prejudice. "The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142.) "CALCRIM No. 362 *limits* the reach of any adverse inference both by telling the jury that it decides the 'meaning and importance' of the evidence and by telling the jury the making of a willfully false statement 'cannot prove guilt by itself.' (CALCRIM No. 362.) CALCRIM No. 362 . . . is [thus] designed to benefit the defense, ' "admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." [Citation.]' (*People v. Covarrubias* (2016) 1 Cal.5th 838, 908 [citations].) And because the evidence cannot prove guilt by itself, a jury would understand that the consciousness of guilt—however deep it ran—was not the equivalent of a confession. [Citation.] Thus, a jury would understand both that false statements were not the equivalent of a confession and that they were not themselves sufficient to prove guilt of the charged crimes." (*People v. Burton* (2018) 29 Cal.App.5th 917, 925.)

Accordingly, the trial court's decision stands.

## II. *Newly amended section 1170, subdivision (b) applies.*

Effective January 1, 2022, our determinate sentencing law (§ 1170) was amended in several fundamental ways. (See Stats. 2021, ch. 731, § 3; Stats.

9

2021, ch. 695, § 6.)  Relevant here, Senate Bill No. 567 amended section 1170, subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist.  (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1) & (2).)[2]  Under newly amended section 1170, a trial court may impose an aggravated prison term only if "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial . . . ."  (§ 1170, subd. (b)(1), (2).)  Based on this new law, defendant contends his upper term sentence for manslaughter cannot stand.

The People correctly concede the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal.  (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308.)  California law requires that we "assume, absent evidence to the contrary, that the Legislature intended an 'amended statute to apply to all defendants whose judgments are not yet final on the statute's operative

---

[2] Under this change in law, a trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.  Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements.  The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense." (Stats. 2021, ch. 731, § 1.3.)

date.'" (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) "For the purpose of determining the retroactive application of an amendment to a criminal statute, the finality of a judgment is extended until the time has passed for petitioning for a writ of certiorari in the United States Supreme Court." (*People v. Lopez, supra*, 42 Cal.App.5th at pp. 341–342, citing *People v. Vieira* (2005) 35 Cal.4th 264, 305–306.)

Accordingly, because the new version of section 1170, subdivision (b) constitutes an ameliorative change in our determinate sentencing law and the judgment in this case is not yet final, defendant's upper term sentence must be vacated and the matter returned to the trial court for resentencing.

## DISPOSITION

The matter is remanded to the trial court for resentencing under the amendatory version of section 1170, subdivision (b) effective January 1, 2022. The judgment is otherwise affirmed.

_____
Jackson, P. J.

WE CONCUR:

_____
Needham, J.

_____
Burns, J.

A160680/*People v. Gabriel Anthony Cardin-Heredia*

11