Filed 1/23/26  P. v. Sagastizado CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>ERIK SAGASTIZADO,<br><br>　　　Defendant and Appellant. | B336279<br><br>(Los Angeles County<br>Super. Ct. No.<br>LA098752) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard H. Kirschner, Judge.  Affirmed.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Nicholas J. Webster and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Erik Sagastizado (defendant) appeals from his convictions for one count of premeditated murder, four counts of attempted premeditated murder, one count of conspiracy to commit murder, and one count of being a felon in possession of a firearm—after defendant handed Kevin Gomez a gun, drove Gomez to an alleyway, waited while Gomez walked to a carport where he opened fire on five people, and then drove Gomez back to the duplex where they hung out. Defendant argues that his convictions are tainted by several erroneous evidentiary rulings. Defendant forfeited most of these arguments by not objecting, and none of them justify vacating the convictions—either individually or cumulatively. We accordingly affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**I.    Facts**

Around 8 p.m. on December 28, 2022, a man in a hoodie approached five men gathered in a carport off an alley in North Hollywood. The man pulled out a gun and, through a locked gate, fired six or seven shots; bullets struck three of the men, and one of them died from his wounds. The shooter ran back down the alley to a waiting van.

Surveillance video from businesses and residential Ring cameras enabled law enforcement to string together and thereby reconstruct the van's movement to and from the carport alley. The van had departed from a duplex approximately 2.5 miles

2

away, parked in an alleyway where the shooter got out of the passenger's side, and returned to the duplex after the shooter ran back to the van after the shooting.

Defendant featured prominently in the video as the van's driver.  The video depicted him hiding a firearm in the front wheel well of a vehicle parked outside the duplex, checking its location several times, and ultimately removing the gun and putting it in the pocket of his hoodie just minutes before departing for the carport alley in the van.  The video further showed that, during the outbound trip to the alley, Gomez, the passenger, donned the hoodie containing the firearm defendant had retrieved.  The video showed defendant driving the van to and from the carport alley.  And it depicted him driving back to the duplex.  The video also depicted Gomez getting into and out of the van at the carport alley.

Cell phone records for a cell phone used by defendant and for a cell phone registered to Gomez reflected connections with cell towers along the route from the duplex to the alley and back to the duplex during the times that the van was depicted on the various surveillance videos.

## II.    Procedural Background

The People charged defendant with (1) premeditated murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)),[1] (2) four counts of attempted premeditated murder (§§ 187, subd. (a), 664,

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

3

(3) conspiracy to commit murder (§ 182, subd. (a)(1)), and (4) being a felon in possession of a firearm (§ 29800, subd. (a)(1)).[2]

The matter proceeded to a jury trial, and the jury found defendant guilty of all charges.

The trial court imposed a prison sentence of 25 years and 8 months to life plus four consecutive terms of life imprisonment. More specifically, the court imposed a sentence of 25 years to life on the premeditated murder count, plus four consecutive terms of life with the possibility of parole for each attempted premeditated murder conviction, plus a consecutive term of eight months on the felon-in-possession charge. The court stayed any sentence on the conspiracy count under section 654.[3]

Defendant filed this timely appeal.

## DISCUSSION

## I. Admission of Officer Testimony That Undercover Jail Cell Operation Yielded No Incriminating Statements

### A. *Pertinent facts*

When defendant was arrested on March 1, 2023, law enforcement transported him to a police station holding cell where an undercover officer was present. The officer engaged defendant in conversation for 45 minutes, but defendant made no incriminating statements about the charged crimes. Detective

---

[2]     The People further alleged multiple aggravating factors pursuant to California Rules of Court, rule 4.421, but later elected not to proceed with them.

[3]     The abstract of judgment incorrectly reflects that this sentence was imposed consecutively. We will order the abstract of judgment corrected. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

4

Sharon Kim (Detective Kim) pulled defendant out of the cell for a few minutes, then returned him to the cell with the undercover officer. Defendant again said nothing incriminating.

It was defendant who first elicited evidence of this operation—called a "*Perkins* operation"[4]—during cross examination of Detective Kim. On redirect examination, the prosecutor asked whether Detective Kim had "participated in other *Perkins* operations where a person you have arrested and put into a cell with an operator has also not made any admissions to the crime itself." Defendant "object[ed] as to relevance as to 'other operations.'" After the trial court overruled the objection, Detective Kim responded that it was not "unusual" "not to have a confession or [] admission" from a *Perkins* operation because "it is widely known now that [law enforcement] conduct[s] these types of operations." Detective Kim mentioned that she had "actually been part of *Perkins* operations" where she overheard "one defendant tell another" not to "say anything." On recross examination, Detective Kim noted that no one in this case told defendant that "there could be undercover officers in the [holding] cell and [that] he shouldn't say anything."

B. *Analysis*

Defendant argues that the trial court erred in admitting Detective Kim's testimony explaining why it was not so "unusual" for defendant *not* to make incriminating remarks during the *Perkins* operation in this case. Specifically, defendant argues that this testimony (1) was not relevant, (2) should have been

---

[4] The name comes from the U.S. Supreme Court case— *Illinois v. Perkins* (1990) 496 U.S. 292—which held that such operations did not violate a criminal defendant's rights under *Miranda v. Arizona* (1966) 384 U.S. 436.

excluded because its probative value was substantially outweighed by danger of unfair prejudice under Evidence Code section 352, (3) should have been excluded as propensity evidence under Evidence Code section 1101, and (4) constituted an unconstitutional comment on a defendant's silence in violation of *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).  We review a trial court's evidentiary rulings for an abuse of discretion (*People v. Flores* (2020) 9 Cal.5th 371, 409 (*Flores*)), and review its interpretation of constitutional law de novo (*People v. Cromer* (2001) 24 Cal.4th 889, 894).

As a threshold matter, the sole objection that is properly before us is defendant's relevance objection.  That is because evidentiary objections are preserved for review on appeal only on the specific grounds articulated to the trial court (*People v. Williams* (2008) 43 Cal.4th 584, 620; Evid. Code, § 353), and the sole objection defendant made to Detective Kim's testimony regarding the *Perkins* operation was relevance; thus, the other bases defendant advances on appeal for objecting to this testimony are forfeited.  Defendant counters that his trial counsel's failure to object constitutes ineffective assistance of counsel.  To excuse a forfeiture on this basis, a defendant must show that his counsel's performance was deficient (*Strickland v. Washington* (1984) 466 U.S. 668, 687).  Because, as we explain, none of the grounds defendant raises has any merit, all of his claims fail—either on their merits or because the failure to make a meritless objection does not constitute deficient performance. (*People v. Memro* (1995) 11 Cal.4th 786, 834.)

Detective Kim's testimony on this point was relevant. Defendant had been the one to first elicit testimony regarding the *Perkins* operation, and that testimony suggested that defendant

6

was innocent because he did not incriminate himself during the operation.  Detective Kim's testimony that *Perkins* operations were "widely known" suggests a different reason for the absence of any incriminating statements—not that defendant was innocent and thus had nothing incriminating to say, but rather that defendant was guilty and knew better than to say anything.  Because this latter testimony has a "tendency in reason to . . . disprove" defendant's innocence-based theory for why he did not incriminate himself, it is relevant.  (Evid. Code, § 210.)  That Detective Kim's testimony does not establish defendant's subjective knowledge of the *Perkins* operation being conducted *in this case* does not render the evidence irrelevant because the widely known nature of such operations still tends to prove that defendant may have known to be wary.

Detective Kim's testimony on this point was also admissible under Evidence Code section 352 and did not constitute impermissible propensity evidence.  Defendant suggests that Detective Kim's testimony ran afoul of both of these provisions because that testimony suggested that defendant was aware of the "widely known" *Perkins* operations, which meant he was "criminally-sophisticated" and hence had a disposition to commit criminally sophisticated crimes.  Although Evidence Code section 1101 generally "bans" "evidence of a [defendant's] propensity or disposition to engage in a type of conduct" "to prove [that he did so] on a specified occasion" (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; Evid. Code, § 1101, subd. (a)), and although the risk that a jury might misconstrue evidence as propensity evidence might render its admission "unduly prejudicial" under Evidence Code section 352, Detective Kim's testimony that *Perkins* operations do not always yield incriminating statements because

7

they are "widely known" does not constitute propensity evidence that is inadmissible under either Evidence Code section 1101 or section 352. A person's decision not to speak when they know speaking might get them into trouble is not evidence of that person's "criminal sophistication." Because there is *zero* danger that any jury would construe Detective Kim's testimony as defendant suggests, defendant's arguments premised on that construction fail.

Detective Kim's testimony also does not run afoul of *Doyle*, *supra*, 426 U.S. 610. *Doyle* holds that, once a suspect is given *Miranda* warnings that include advising the suspect of his right to remain silent, the prosecution may not use that suspect's subsequent silence against him—either to impeach that suspect's testimony at trial or as substantive evidence of his consciousness of guilt; to do so, *Doyle* holds, violates due process because the government in this situation is going back on its promise not to use the suspect's silence against him. (*Doyle*, at pp. 618-620; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118.) The trial court's ruling admitting Detective Kim's testimony that *Perkins* operations are widely known—such that defendant's failure to incriminate himself during the operation in his case may be indicative of his carefulness rather than his innocence— neither violates *Doyle* nor constitutes impermissible prosecutorial conduct aimed at commenting on a defendant's silence. We reach this conclusion for several reasons. To begin, there is no evidence that defendant was ever given *Miranda* warnings, which is a critical prerequisite to any *Doyle* violation (*People v. Bowman* (2011) 202 Cal.App.4th 353, 363); defendant acknowledges as much when he indicates that we may only "fairly infer[]" such warnings were given by virtue of the fact that Detective Kim

8

pulled defendant out of the holding cell for a few minutes.  Even if we assume *Miranda* warnings were given, defendant was not silent while in the holding cell; instead, he talked to the undercover agent but merely failed to say anything incriminating.  Use of a defendant's post-*Miranda silence* is another fundamental premise of a *Doyle* violation.  (See *Anderson v. Charles* (1980) 447 U.S. 404, 408 ["a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.  As to the subject matter of his statements, the defendant has not remained silent at all."].)  And Detective Kim's testimony about the widespread knowledge of *Perkins* operations only occurred after *defendant* raised the issue of the *Perkins* operation in the first place, but *Doyle* cannot be "used to 'cut off the prosecution's "fair response" to the evidence or argument of [a] defendant.'"  (*People v. Delgado* (2010) 181 Cal.App.4th 839, 853.)

## II.    Exclusion of Evidence That the Van Driven by Defendant Had DNA from Multiple Contributors

### A.    *Pertinent facts*

Investigating officers swabbed portions of the van that was driven to and from the scene of the shooting, and submitted those swabs for DNA analysis.  The sample from the van's steering wheel had a "mixture" of DNA from three possible contributors, one of whom was male; the sample from the van's gear shift on the steering column had "four contributors"; and the sample taken from a surgical mask hanging on the gear shift column had "five contributors."  When uploaded to the Combined DNA Index System (CODIS) database, there was only one "hit"—namely, that the DNA of one of the contributors on the steering wheel matched defendant's brother's DNA.  Law enforcement did not

9

seek DNA "reference samples" from other suspects, including defendant.

In a hearing outside the jury's presence, defendant sought to introduce the above-described evidence regarding multiple contributors to the DNA found in the van and to introduce the fact that law enforcement did not obtain "reference samples" to compare to the DNA found in the van; defendant did not seek to admit the evidence of the match to defendant's brother. Defendant acknowledged that other evidence at trial—including video evidence—otherwise established that defendant's brother had at times driven the van, but urged that the existence of other unknown contributors to DNA in the van was still relevant to refute the testimony of three law enforcement officers who testified they only saw defendant driving the van and that law enforcement's failure to obtain reference samples showed an inadequate investigation. Detective Kim testified that the DNA fragments found in the van could have gotten there—not because the contributors directly touched the van themselves—but due to "transfer touch DNA."

The trial court excluded the evidence of DNA from the van under Evidence Code section 352. The court reasoned that the probative value of the DNA found in the van was "slight" and "probably close to zero" because it "doesn't cue in on anybody in particular or when that [DNA] sample was deposited" and thus was not "indicative of actually somebody driving" the van, and because evidence that defendant's brother drove the van was already in evidence. The court further reasoned that admitting the DNA evidence would "confuse the issues," result in "undue consumption of time" and "create[] undue prejudice"—even if defendant only planned on calling two witnesses to support the

10

DNA—because it would raise "all sorts of issues," including issues regarding contamination.

In closing argument, defendant argued that "no DNA" tied him to the van.

### B.    *Analysis*

Defendant argues that the trial court erred in excluding evidence regarding the DNA contributors found in the van, and that this evidentiary error also violated due process, his Sixth Amendment right to confront witnesses, and his due process right to present a defense.

Evidence Code section 352 grants trial courts "broad discretion" to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352; *People v. Merriman* (2014) 60 Cal.4th 1, 74.)  The juvenile court did not abuse its broad discretion in this case.  The evidence that DNA belonging to unknown contributors was found in the van had minimal probative value, as it would not establish that defendant was not driving the van on the night of the charged shootings; indeed, that the DNA specifically tied to an individual— defendant's brother—was found in the van added nothing to the mix of evidence (and did not appreciably impeach any of the People's witnesses) because the fact that defendant's brother drove the van was already admitted through other evidence.  The court acted within its discretion in determining that the value of this marginally probative evidence was substantially outweighed by the time it would take, and the confusion it would sow, for the People to explain why the multiple, unidentified DNA

11

contributors did not establish that those contributors were actually inside the van or drove the van. The probative value of this evidence to show that the People's investigation was not thorough was also properly excluded under Evidence Code section 352 because the chief issue at trial was whether defendant was driving the van on the night in question—a fact established by the surveillance videos and other testimony—rather than whether further investigation might have identified other people who may have driven the van at some other unspecified point in time; and the same concerns about undue consumption of time and confusing the issues apply, making exclusion reasonable under Evidence Code section 352. Because the court acted within its discretion, there is also no constitutional violation. (*People v. Robinson* (2005) 37 Cal.4th 592, 626-627 ["'[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense'"].)

The sole further argument defendant makes is that the shortcomings in the DNA evidence collected by the People go to the weight of the evidence, and not its admissibility—and thus make it immune from exclusion under Evidence Code section 352. This argument fundamentally misunderstands the function of Evidence Code section 352, which is to give courts a mechanism for weighing the probative value of evidence against considerations favoring its exclusion; if, as defendant asserts, courts had to admit evidence under Evidence Code section 352 if it had *any* weight, that section would cease to have any purpose whatsoever. We are not allowed to nullify statutes. Defendant cites several cases purporting to support his position—namely, *People v. Ramirez* (2022) 13 Cal.5th 997, 1120; *People v. Goldman*

12

(2014) 225 Cal.App.4th 950, 960; and *People v. Mullens* (2004) 119 Cal.App.4th 648, 660.  However, in each of those cases, the court *admitted* evidence under Evidence Code section 352 and rejected arguments to overturn that ruling, in part on the ground that it was up to the *jury* to assess the weight of the admitted evidence.  These cases do not require us to disregard Evidence Code section 352.

### III.   Admission of Taped Call Between Detective Kim and Eyewitness

#### A.   *Pertinent facts*

Prior to trial, the People sought to admit evidence that the shootings were gang motivated, even though defendant was not charged with any gang enhancement.  At a pretrial hearing, the trial court excluded all gang evidence under Evidence Code section 352, reasoning (1) that such evidence had minimal probative value because there was "no evidence that the victims were actual or perceived gang rivals, or that th[eir] physical appearance was in any way gang-related" and because there was no evidence of "gang-related statements by the shooter or anyone else," and (2) that this minimal probative value was outweighed by the possibility that admitting gang evidence would "create [] substantial danger of undue prejudice, as well as confuse the issues, as well as mislead the jury, as well as necessitate an undue consumption of time."

During trial, the eyewitness whose parents lived next door to the duplex from which the van left and returned on the night of the shooting took the stand.  During her testimony, she repeatedly stated that she did not "feel comfortable" answering the prosecutor's questions, repeatedly denied knowing anything or interacting with anyone at the duplex, denied ever identifying

13

defendant to law enforcement, and denied ever calling 911 in December 2022. The People asked the court to admit the 911 call the eyewitness made on December 28, 2022, and the court admitted this evidence. During the call, the eyewitness reported that she saw someone with "a gun on the side of his hip" at the duplex, and also opined that the gun-toting person was "a gang member." The court recognized that the 911 call used the word "gang," but admitted the call anyway, reasoning that its previous ruling excluded gang evidence when proffered "to show motive" for the shooting, but the 911 call was now being admitted for a different reason—namely, as evidence bearing on the eyewitness's "credibility" with respect to the witness's reluctance to testify; for this different purpose, the court reasoned, "it is relevant and under [Evidence Code section 352] it is more probative than prejudicial at this point."

After playing the 911 call, the eyewitness further testified that Detective Kim had harassed her repeatedly for nearly a year in trying to get her to testify despite the eyewitness purporting to know nothing, and that the eyewitness was unhappy to be in court to testify because she did not "want to put an innocent person in jail." The People asked the trial court to admit a recording of a telephone call between Detective Kim and the eyewitness,[5] in which the eyewitness expressed her gratitude toward Detective Kim, her belief that her parents' neighbors were "dangerous," and her preference not to be identified or to testify as a result. The court ruled that the recording could be admitted

---

[5] This was the first of two recorded telephone conversations between Detective Kim and the witness on the same day. The second conversation was previously admitted into evidence and is not being challenged by defendant on appeal.

14

because it was "very much inconsistent with what [the eyewitness] is saying now," which made it "relevant to th[e eyewitness's] credibility and motivation for her testimony."

**B.** *Analysis*

In his opening brief, defendant argued that the prosecutor engaged in misconduct by playing the first recorded telephone conversation in violation of the trial court's order barring the admission of gang evidence. When the People pointed out in the respondent's brief that the trial court had modified its initial ruling, defendant withdrew this argument in his reply brief. Defendant narrowed his argument to objecting that the trial court should not have admitted the recorded conversation because, during the conversation, Detective Kim said that she knew how "gangs" "use intimidation tactics," because the eyewitness said that "when [gang members] see cop cars, they scatter like roaches," and that Detective Kim said that law enforcement faces resource shortages in responding to harassing behavior by neighbors. Defendant seems to argue that the court should have undertaken a line-by-line examination of each statement in the recorded conversation, and that its failure to do so resulted in the admission of evidence that is irrelevant, evidence subject to exclusion under Evidence Code section 352, and improper propensity evidence—all of which violated due process.

We reject defendant's pared down argument. For starters, defendant did not object on any of these grounds before the trial court, so he forfeited these objections. (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 434-435 [due process objection must usually be separately made].) Defendant responds that his trial counsel was constitutionally ineffective for failing to object

15

on these grounds. However, we reject this further assertion. Defense counsel's failure to object did not constitute deficient performance because, on direct appeal, deficient performance is established only if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Here, a tactical reason can be discerned for the absence of an objection to the recorded conversation—namely, any objection was likely to be overruled because the gist of the conversation was inconsistent with the eyewitness's testimony and, given that the jury had already heard one reference to a "gang" (on the already admitted 911 call), further objections to fleeting references to "gang" members that did not specifically mention defendant risked calling additional attention to the gang issue. What is more, there is no reasonable probability that excision of these passing references would have led to a different outcome (thereby satisfying the "prejudice" requirement for an ineffective assistance of counsel claim) because the other trial evidence— including defendant's movements to and from the murder scene being captured on video and syncing with the movement of the cell phone he used—overwhelmingly established his guilt.

## IV. Admission of Detective Kim's Testimony Identifying Defendant on the Surveillance Videos

### A. *Pertinent facts*

Detective Kim testified that she watched the series of surveillance videos that tracked defendant and Gomez from the duplex to the alleyway and back, and she was able to identify defendant in many of those videos. Detective Kim explained that

16

she watched the videos showing the duplex on the date of the shooting "hundreds" of times, sometimes "frame by frame" and sometimes "zoomed in," and that she watched video footage showing the duplex on other dates "several times," including between 24 and 35 hours' "worth of video footage." Detective Kim explained that she was able to identify defendant in these videos based on "what he is wearing," "his stature," how he "walks," and his "facial features" when they are visible on the video—and that she corroborated what she viewed by examining whether what she saw matched "clear footage from earlier on in the day" as well as the location of the cell phone defendant was known to use. Detective Kim also identified defendant's brother (as distinct from defendant) on some videos. Defendant objected that Detective Kim lacked "personal knowledge" to opine about what is on the videos and that her testimony amounted to a "legal conclusion" when she identified defendant in the videos; the trial court overruled both objections.

### B. *Analysis*

Defendant argues that the trial court erred in allowing Detective Kim to identify him on the surveillance videos. We review this evidentiary ruling for an abuse of discretion. (*Flores*, *supra*, 9 Cal.5th at p. 409.)

It is well settled that a lay witness may identify a person based on their gait, stature, facial features, clothing or other distinguishing physical characteristic as long as the witness has sufficient familiarity with the identified feature(s). (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 522 ["'[T]he identity of a defendant may be established by proof of any peculiarities of size, appearance, similarity of voice, features or clothing'"]; *People v. Larkins* (2011) 199 Cal.App.4th 1059, 1067 (*Larkins*)

17

["distinguishing characteristics" include "posture, gait and body movements"].)  It is equally well settled that a lay witness may offer such an identification opinion on the basis of familiarity with that characteristic acquired by observation in person or on a video.  (*People v. Leon* (2015) 61 Cal.4th 569, 600-601; *People v. Son* (2020) 56 Cal.App.5th 689, 693, 697 (*Son*).)

The trial court did not abuse its discretion in admitting Detective Kim's lay opinion testimony identifying defendant on the surveillance videos.  Detective Kim testified that she was familiar with defendant's stature, his gait, his facial features and, as to videos close together in time, his clothing.  She also testified that she obtained this familiarity by watching the video footage of the duplex on the day of the shootings "hundreds" of times and the video from other days dozens of times, and that her study of the videos was the basis for her opinions that it was defendant depicted on the videos—an opinion which the jury was instructed it could "disregard" based on the witness's "opportunity to perceive the matters on which . . . her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion."

Defendant resists this conclusion with what boils down to two arguments.  First, defendant asserts that Detective Kim's identification of defendant on the videos was an *expert* opinion, not a *lay* opinion—because Detective Kim at one point testified about her knowledge and skills as a detective; explained how she watched the videos; and admitted she used the zoom feature.  We reject this assertion.  The *substance* of what Detective Kim did— carefully watching videos over and over again to pick out details that a casual observer might miss in order to identify who is in the video—is not the subject of expert testimony because it is not

18

"sufficiently beyond common experience." (Evid. Code, § 801, subd. (a).) In 2024, a videotaped recording could readily be reviewed in detail, and use of the "zoom" feature did not require any special expertise. That Detective Kim's testimony covered other topics on which her expertise as a law enforcement officer would be important did not somehow transmogrify the otherwise lay nature of her opinion testimony with regard to identifying defendant on the videos. We reject defendant's related assertion that Detective Kim invaded the province of the jury by offering an opinion on defendant's ultimate guilt; identifying defendant as a person depicted on a video—while supporting a guilty verdict—is *not* an opinion on guilt or innocence. (Cf. *People v. Vang* (2011) 52 Cal.4th 1038, 1048.) Second, defendant argues that even if we consider Detective Kim's opinion to be a lay opinion, it is still impermissible because she "did not know [defendant] before the crimes" and there is no evidence that defendant changed his appearance after the shootings. These arguments also lack merit. A lay witness may become familiar with defendant after the crime but before testifying. (*Larkins*, *supra*, 199 Cal.App.4th at 1067.) And, a change in appearance is unnecessary when the lay witness's testimony assists the trier of fact by identifying certain characteristics of a defendant that have not changed. (*Son*, *supra*, 56 Cal.App.5th at p. 697.)

## V.     Cumulative Error

Defendant lastly contends that the evidentiary errors committed by the trial court, even if not individually problematic, cumulatively warranted reversal. Although we may examine the cumulative effect of multiple errors (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1064), here we have concluded that defendant has demonstrated *no* error; there is nothing to cumulate.

19

## DISPOSITION

The clerk of the superior court shall prepare an amended abstract of judgment reflecting the stayed sentence on the count of conspiracy to commit murder (§ 182, subd. (a)(1)).  The court shall deliver the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, P. J.
HOFFSTADT


We concur:


_____, J.
KIM (D.)


_____, J.
KUMAR*


---

*       Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.